Ervin JOHNSON, Jr., Plaintiff,

v.

SOUTHWEST DETROIT COMMUNITY MENTAL HEALTH SERVICES, Mary Maloney, Jerry Wenders, Justine R. Murphy, Gary Benjamin, Consuelo Alcala, Peggy Posa, Annette Zipple, Patrick Ryder, Othalia Walker Downs, Justin C. Ratvitz, Betty Hogan, and Israel Pena, Defendants.

Civ. No. 77–71825.

United States District Court, E. D. Michigan, S. D.

Nov. 29, 1978.

Elaine Frost, Detroit, Mich., for plaintiff.

Carl B. Bolden, Jr., Detroit, Mich., for defendants.

## MEMORANDUM OPINION

RALPH M. FREEMAN, District Judge.

On July 31, 1978, the plaintiff, Ervin Johnson, Jr. filed a supplemental complaint against the Southwest Detroit Community Health Services, Inc. and the members of its executive board and personnel committee.[1] The complaint alleges that on February 27, 1975, the plaintiff and Southwest, a private non-profit corporation, entered into a contract whereby the plaintiff accepted employment as Southwest's Component Director. On April 8, 1977, Mr. Johnson approached agents of the Federal Bureau of Investigation to ascertain whether certain conduct of the Executive Board and Chief Executive officer of Southwest was in violation of federal law. Thereafter, according to the complaint, the members of the executive board met and first, placed Mr. Johnson on a paid leave of absence and then discharged him as the result of his going to the FBI. The plaintiff then filed a grievance with Southwest's personnel committee and the committee affirmed the actions of the executive board.

The complaint seeks redress under the United States Constitution and 42 U.S.C. § 1983 alleging that the executive board and personnel committee were acting under color of state and federal law and deprived the plaintiff of his Fourteenth Amendment right to due process and First Amendment right to free speech. The complaint also seeks relief for an alleged breach of the plaintiff's employment contract by Southwest.

The matter is now before the Court on the defendants' motions to dismiss and/or for summary judgment and their motion to strike the plaintiff's demand for punitive damages.

The defendants first assert that the Court has no jurisdiction over the plaintiff's constitutional claims either under 28 U.S.C. § 1331 or 28 U.S.C. § 1343. The defendants' basic contention is that neither the federal nor state governments has become sufficiently entangled in the actions of Southwest such that its conduct must conform to constitutional standards of behavior.[2]

In support of his allegation that state action is present in this case, the plaintiff relies on several facts. First, the plaintiff points to the Community Mental Health Centers Act, 42 U.S.C. § 2689, *et seq.*, under which Southwest receives federal aid. The Act specifies the type of services a community health center may render, the structure and composition of its governing body, and regulations under which it must operate. Pursuant to the Act, Southwest has received between 37.5% and 66% of its funding from the federal government for the three fiscal years ending in 1977. In addition, in only one of the last five fiscal years has Southwest received less than 90% of its funding from state and federal governments. The plaintiff also points out that the Department of Health, Education and Welfare conducts site visits which deal with and recommend changes in all facets of the operation of the center.

With respect to the involvement of the State of Michigan, the plaintiff notes that in order to receive federal funding the State has adopted a plan relating to community health centers which has been approved by the Secretary of HEW.[3] In addition, Southwest is regulated under state statutory provisions (M.C.L.A. § 330.1001 *et seq.*) and the Wayne County Community Health Services Board and the State Department of Mental Health also perform

---

1. As used in this opinion, the term "Southwest" encompasses both the corporate and individual defendants.

2. Although the plaintiff has asserted § 1331 as a jurisdictional base he does not allege any federal cause of action other than those arising from the Constitution and 42 U.S.C. § 1983. Therefore the question is whether Southwest must conform to constitutional standards of

conduct because of its involvement with these government entities.

3. *Excerpts of the plan submitted by the plaintiff describe the State mental health system in general. These excerpts also describe the role that community health centers play in such a plan. The plan makes certification by the State a prerequisite to federal funding for a mental health center.*

site visits as detailed as those of the federal government.

Finally, the plaintiff relies on the various tax benefits provided Southwest by the State and Federal government as a non-profit organization.

While an issue such as this is not easily determined, three Supreme Court decisions are generally recognized as relevant to a determination of whether the state or federal government's involvement with a private entity subjects that entity to constitutional scrutiny. In *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the Court found that the actions of a restaurant leasing space in a public parking facility in refusing to serve Blacks constituted state action because the lessor-lessee relationship was of a symbiotic nature; the State failed to exercise its power to require the restaurant to integrate; and the segregation complained of contributed to the financial success of the government agency owning the parking structure.

Later, in *Moose Lodge v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the Court considered whether the actions of a fraternal organization in refusing to serve a Negro constituted state action. The Court found no state action despite state liquor licensing and control laws. In so doing, the Court was careful to point out that the state regulation in question in no way promoted the charged acts of discrimination.

Still later in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Court considered whether the actions of a state regulated utility in terminating services to a customer were subject to the due process requirements of the 14th Amendment. In *Jackson*, the Court stated the issue as follows:

> While the principle that private action is immune from the restrictions of the Fourteenth Amendment is well established and easily stated, the question whether particular conduct is "private" on the one hand, or "state action" on the other, frequently admits of no easy answer. . . . But the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. *Id.* at 349–351, 95 S.Ct. at 453.

Despite the fact that the defendant was a heavily regulated corporation with a State granted monopoly, the Court found no state action. The Court based its finding on the following: (1) there was an insufficient relationship between the challenged actions of the utility and its monopoly status; (2) the service supplied by the utility was not of a type which is traditionally associated with sovereignty; (3) the State's failure to overturn the practices used in terminating services did not make these practices state action; and (4) there was no symbiotic relationship between the State and the private entity.

■ Thus, it is apparent that the generalized type of analysis applied originally in *Burton* has been narrowed by the decisions in *Moose Lodge* and *Jackson*, to the extent that a plaintiff must either show a nexus between the State and the challenged activity or a symbiotic relationship between the State and the private entity.

■ The Court is of the opinion that the plaintiff has failed to demonstrate the existence of state or federal action in this case. While the Court recognizes that Southwest is subject to pervasive state and federal regulation regarding the services it provides, its structure, organization and staffing, this regulation had no connection with Southwest's decision to terminate the plaintiff or the manner in which the termination was accomplished. Absent such a connection, the existence of state or federal regulation is insufficient to impose a constitutional standard of conduct upon Southwest. *Jackson, supra.*

Nor does the Court believe that the federal or state funding present here renders Southwest's termination of Mr. Johnson's state action. While governmental funding makes up most of Southwest's budget, the plaintiff points to no nexus between the

funding and Southwest's actions with respect to Mr. Johnson. Cases which have considered federal and state funding in similar contexts have generally found such funding insufficient to satisfy the *Jackson* criteria. For example, in *Greco v. Orange Memorial Hospital Corp.*, 513 F.2d 873 (5th Cir. 1975), cert. den. 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975), the plaintiff challenged the policy of a private hospital in not permitting elective abortions, claiming that the hospital's action constituted state action. The major indicia of state action in that case were (1) financing of the original construction costs of the hospital through federal Hill-Burton funds and voter authorized hospital bonds; (2) issuance by county commissioners of hospital time warrants to finance additions to the hospital; (3) county ownership of the land and building which housed the hospital; (4) a lease of this land and building to the hospital corporation at the rate of $1.00 per year; and (5) federal, state and local tax exemptions. Despite these substantial financial benefits from the government, the Court found no state action.

> [W]e find that Orange County is not sufficiently connected with the Orange Memorial Hospital Corporation's activities to imbue those actions with the attributes of the state. *The involvement of the County is not sufficiently connected with the Orange Memorial Hospital Corporation's decision to prohibit elective abortions to justify to the corporation's imposition Constitutional restrictions upon daily business of the hospital.* Id. at 882. (Emphasis added).[4]

Similar decisions have been rendered in other circuits. In *Jackson v. Norton-Children's Hospital, Inc.*, 487 F.2d 502 (6th Cir. 1973), cert. denied 416 U.S. 1000, 94 S.Ct. 2413, 40 L.Ed.2d 776 (1974), the Court held that the receipt of Hill-Burton funds by a hospital was insufficient to make the acts of the hospital state action. In *Schlein v. Milford Hospital Inc.*, 561 F.2d 427 (2nd Cir. 1977), the Court found no state action in a

hospital's denial of staff privileges to a doctor despite the fact that the hospital was: (1) regulated by the Connecticut Department of Health; (2) received federal and local tax exemptions; (3) was empowered by the state to annex contiguous land and (4) received Hill-Burton funds. In doing so, the Court stated:

> . . . As we said in *Powe v. Miles,* 407 F.2d 73, 81 (2d Cir. 1968), "the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury." . . . The State of Connecticut has not been shown to have played any part in the formulation or implementation of the procedures and standards utilized by the Medical Staff and Board of Directors of the Hospital in reaching their decision to reject Dr. Schlein's application for staff privileges. Nor has the state played any role in the making of the decision itself.

In *Briscoe v. Bock*, 540 F.2d 392 (8th Cir. 1976), a physician alleged that he had been terminated as a staff member of the defendant hospital in violation of his constitutional rights. In support of his claim that the acts of the hospital were those of the state, the plaintiff submitted the following evidence: (1) the hospital was a corporation chartered by the state; (2) it was the subject of extensive state regulation; (3) it had received substantial governmental aid in the form of Hill-Burton funds; (4) it was also the recipient of funds under the Medicare and Medicaid Programs and the Missouri Regional Medical Program; and (5) the hospital was a member of the Alliance for Regional Community Health (ARCH), an organization financed by state and federal funds. Despite these contacts with the State, the Court in *Brisco* held that the plaintiff had failed to satisfy the test set forth in *Jackson*.

> *Jackson* makes it clear, however, that an action taken by a private corporation is not necessarily or automatically "state

4. In reference to plaintiff's regulation argument, it is important to note that the lease executed by the County and the hospital in

*Greco* imposed comprehensive regulations on the actions of the hospital.

action" merely because the corporation is chartered by the state, or because the corporation has a state conferred monopoly, or because the activities of the corporation are strictly regulated by the state, or because the functions performed by the corporation serve the public convenience and necessity. Before the action in question can properly be characterized as "state action," there must be a "sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." 419 U.S. at 351, 95 S.Ct. at 453.

.    .    .    .    .

In the instant case there is nothing to indicate that there was any connection between plaintiff's dismissal from the staff of the hospital and the fact that the hospital had received Hill-Burton or other public funds, or the fact that the hospital has a tax exempt status or the fact that the hospital was subject to state regulation, or the fact that in 1974 the hospital was an active member of ARCH. Hence, there is no such nexus between the state's relationship to the hospital's operation and the dismissal of the plaintiff as to justify attribution of the challenged action of the hospital to the state. *Id.* at 395–96.

In light of these decisions, the Court is of the opinion that the various governmental contacts relied on by the plaintiff are insufficient to establish that Southwest's actions were under color of state or federal law. Although Southwest's contacts with the state and federal governments are substantial, there is no showing that the state or federal government had any connection whatsoever with the procedure used in terminating Mr. Johnson's employment. While the Executive Board which originally decided to fire Mr. Johnson is made up of persons elected by the members of the geographical area serviced by Southwest, there is no showing that the members of the board are in any way governmental officials or associated with the state or federal government. The plaintiff apparently recognizes this by failing to rely on this factor in his brief.

Apparently in recognition of his failure to meet the nexus test, the plaintiff contends that the Court should not apply the *Jackson* test, but should instead find state action from the interdependent relationship of Southwest and the state and federal governments. In support of this argument the plaintiff relies on *Burton v. Wilmington Parking Authority, supra,* and *Holodnak v. Avco Corp., Avco-Lycoming Div. Stratford,* 514 F.2d 285 (2nd Cir. 1975), cert. denied, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975). As already noted, the Court in *Burton* found a restaurant's actions to be state action because of the symbiotic lessor-lessee relationship between the restaurant and a public parking facility. In *Avco,* the plaintiff was discharged from his employment by Avco because of certain statements he made about labor-management relations at Avco. He sued Avco claiming that it had violated his First Amendment rights and that his termination constituted action by the Federal Government because of Avco's relationship with the Defense Department. The Court agreed with the plaintiff finding that the Government and Avco were engaged in a symbiotic relationship much like that which existed in *Burton.* The Court's holding turned on the following factors: (1) a large proportion of the work done at the Avco plant was performed under contract for the Department of Defense; (2) the entire 77 acres on which the plant was built as well as the numerous structures on the land were owned by the United States; (3) most of the machinery and equipment used in the manufacturing process was owned by the Government; (4) Avco paid no rent for the use of the land; and (5) a substantial government "task force" maintained at the plant undertook to assure contract compliance. Based on these factors the Court stated:

Under these circumstances, we find compelling reasons to conclude that the Government "has so far insinuated itself into a position of interdependence with [Avco] that it must be recognized as a

joint participant in the challenged activity, which, on that account, cannot be considered to have been . . . 'purely private' . . . ." *Burton, supra,* at 725, 81 S.Ct. at 862. The enterprise to which the Government contributed land, buildings, and equipment, and for which Avco supplied the labor force, was operated for their mutual benefit—Avco's financial growth, and the Government's constitutional interest in raising and supporting an Army, and providing and maintaining a Navy. U.S.Const. Art. I, § 8, cls. 12, 13. Nor is it irrelevant, particularly in view of the significance of the Vietnam war as it was perceived in 1969, that each had an overriding interest in avoiding the interruption of production through any sort of labor unrest. *Cf. Burton, supra,* at 724, 81 S.Ct. 856. Coupled with the extensive commitment of "power, property and prestige," these factors are sufficient to sustain a finding of governmental action. *Id.* at 289–90.

The Court is of the opinion that both *Burton* and *Avco* are distinguishable from the instant case. The symbiotic relationship found in *Burton* and *Avco* is not present here. In both of these cases the financial success of the private enterprise and the government's financial and contractual interests were intimately related. Here, while Southwest's funding no doubt is dependent on its compliance with federal and state regulations, it is difficult to see how the respective governments' interest in the arrangement rises to the level of the financial interest involved in *Burton,* or the constitutional interest involved in *Avco.*[5] Although the public certainly benefits from services provided by Southwest, the cases cited above involving hospitals have failed to find the existence of a symbiotic relationship in similar situations.

Another important distinguishing factor between *Burton* and *Avco* and the instant case is a clear lack of government benefit from the challenged activity. An impor-

tant part of the Supreme Court's opinion in *Burton* was that the restaurant's refusal to serve Blacks benefited both the restaurant and the parking authority, since integration would have caused a loss of customers to the restaurant and a concomitant decrease in the number of persons using the parking facility. Similarly, as the Court noted in *Avco,* both the government and the defendant had a stake in keeping labor problems to a minimum, thus the firing of the plaintiff was beneficial to both. In the instant case, however, there is no conceivable benefit which the government could have gained from the termination of Mr. Johnson. First, there is obviously no state or federal interest involved in the alleged denial of due process to Mr. Johnson. Second, it is clear that neither the state nor the federal government could receive any benefit from his firing. Indeed, since Mr. Johnson's complaint to the FBI involved an alleged misappropriation of government funds, it would appear that the government's interest would be best served by not having Mr. Johnson terminated.

On balance, the Court is of the opinion that the facts involved in this case are more similar to those presented in the "hospital" cases cited above, than they are to either *Burton* or *Avco.* Thus, the Court is of the opinion that the nexus test set forth in *Jackson* is properly applied to this case.

For the reasons stated above, the Court grants the defendants' motion for summary judgment as to the plaintiff's claims based directly on the constitution and 42 U.S.C. § 1983. As a result, the Court does not reach the issues raised by the defendants regarding whether the plaintiff has stated or has a valid due process claim.

■ Finally, the defendants have moved for summary judgment on the plaintiff's contract claim. The Court is of the opinion that it should dismiss this claim without prejudice. Since the federal claims have been disposed of in this case, the Court lacks jurisdiction over the pendent state

---

**5.** Although the plaintiff's brief alleges that Southwest contracts were with the state and federal governments, he has placed no such

contracts in the record; nor has he elaborated on the content of these agreements or their connection with his termination.

claim. Although pendent jurisdiction is a matter of discretion, the Supreme Court has held that needless decisions of state law should be avoided by federal courts and "if federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the [pendent] state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218. In this case, since the contract claim involves a substantial question of state law and judicial economy would not be promoted by hearing this claim in Federal Court, the Court is of the opinion that the plaintiff's contract claim should be dismissed without prejudice.

An appropriate order shall be submitted.