James BRENNAN, et al., Respondents,

v.

MINNEAPOLIS SOCIETY FOR the BLIND, INC., Appellant.

No. 48162.

Supreme Court of Minnesota.

July 13, 1979.

Gray, Plant, Mooty, Mooty & Bennett, Robert L. Helland, and James R. Lande, Minneapolis, for appellant.

Head & Truhn, Jerome Truhn, and Thomas V. Seifert, Minneapolis, for respondents.

Richard W. Bleecker, Exec. Director of National Association for Accreditation Council, Baer, Marks & Upham, National Accreditation Council, New York City, amicus curia.

Heard before KELLY, SCOTT, and WAHL, JJ., and considered and decided by the court en banc.

WAHL, Justice.

The Minnesota Society for the Blind appeals from the judgment and amended judgment of the Hennepin County District Court. We must decide whether the judgment of the trial court striking down the Society's amendments of its corporate by-laws and articles of incorporation, allegedly designed to exclude plaintiffs from the organization, can be sustained and whether the trial court erred in finding no state action involved in appellant's conduct. We affirm.

Defendant Minneapolis Society for the Blind, Inc. (hereinafter "Society"), incorporated in 1917 as a Minnesota non-profit corporation, provides services to and employs blind and multiple-handicapped Minnesota residents. The Society is operated by an Executive Director and Board of Directors, with a membership of about 2,000 in 1972 and a 24-member Board of Directors in 1971. Until December of 1971, membership dues were $1 per year. Membership was primarily a method of soliciting contributions, with most members being almost completely inactive in the organization. One could become a member not only by paying dues but also by making a direct contribution through a supporting organization, such as the Kiwanis. Directors of the Board traditionally were elected by the membership after being selected by a nominating committee. From time to time certain community organizations were invited to submit the name of one of their members for a director's position.

The Society provides a rehabilitation center and occupational training and treatment, as well as a large workshop. The income produced by the workshop and contributions from the United Way accounted for between 62 and 80 percent of the Society's revenue for the period 1968–71.

An additional source of revenue is fees paid to the Society by the Minnesota State Services for the Blind (hereinafter "SSB"). Pursuant to periodic contracts between the Society and SSB, the Society provides rehabilitation services to SSB clients. Nearly all of the 20 participants in the Society's

rehabilitation center were SSB clients. SSB pays the Society about $850 per month per client, which constitutes 75 percent of that client's cost to the Society.

SSB clients compose the Society's 10-person occupational treatment and training program, which was jointly established by SSB and the Society. SSB pays the Society $350 to $400 per month for each SSB client. During the period of 1968–71, the program services fees paid to the Society by SSB provided between 11 and 23 percent of the Society's gross revenue, which in 1971–72 approximated $1.2 million.

In addition to fees, the Society has received since 1956 about $722,500 in grants from SSB and from the U. S. Department of Health, Education and Welfare with SSB's approval. These grants were specified for construction of the Society's new building, purchase of workshop equipment, remodeling of the workshop, and alteration of its building to establish a regional adjustment center for the blind. The SSB is allowed to provide up to 80 percent of the total project cost and retains a reversionary interest in machinery and equipment purchased with these funds. In connection with the grants, the Society is subject to government reporting requirements, inspections and regulations. In January 1970, SSB assisted the Society in defining the rehabilitation program. The Society is also exempt from federal and state income taxes and from state real estate taxes.

In November 1970, the National Federation for the Blind (hereinafter "NFB") held its national convention in Minneapolis. A resolution was passed whereby NFB would request the Society to allow the blind community to elect three members of the Society's Board of Directors. No blind people sat on the Board at that time. The Society rejected the request.

In early 1971, several blind Society clients approached the legislation committee of the Minnesota Organization of Blind (hereinafter "MOB"), later renamed the National Federation of the Blind in Minnesota, Inc. ("NFBM"), with grievances against the Society. They demanded, among other things, that three blind people be allowed to serve as members of the Society's Board of Directors. Over the next six months, MOB representatives met at least three times with Society representatives with respect to the request for Board representation for the blind community. In August 1971, MOB demanded that two-thirds of the Society Board be elected by the blind community. Responding to these demands, the Board president, at the Society's September Board Meeting, told the directors that "disappointing criticisms" from "irresponsible critics" could not be allowed to jeopardize the Society's plans for its community support. The critics, or some of them, were then told by a Board member to become members of the Society if they wished to have input into its affairs. Shortly thereafter, several of the six plaintiffs, all blind, became members of the Society.

Meanwhile, unbeknown to plaintiffs, as a condition of a grant contract in 1971, SSB required the Society to make reasonable efforts to include the Society's consumers, meaning the blind, on the Society's Board of Directors. On September 22, 1971, the Society nominating committee of the Board offered director positions to the presidents of the United Blind (hereinafter "UB") and MOB. Both declined, one citing the fact that negotiations for electing blind representatives were continuing, and the other stating that he was unable to make such a time commitment. In October 1971, at the Society's request, the MOB and UB submitted two names from each organization for the director's positions, taking the stance that unless the Society accepted all four individuals as Board members, none would accept a position. One of the four individuals was offered a position by the Society and was elected to the Board. Three other blind persons, not members of UB or MOB, were elected to the Board.

At the December 15, 1971 Board Meeting, one of the new blind Board members presented a resolution, which was rejected, that one-third of the Board be elected by the blind community. At the same meeting, the Board enacted four amendments to the bylaws:

1. The Board could terminate any member by written notice for reasons deemed satisfactory to it.

2. Annual membership dues were increased from $1 to $5.

3. Cumulative voting was prohibited.

4. Nominations for Board positions had to be in writing, signed by at least 25 members in good standing, delivered to the secretary at least 15 days before the Annual Meeting. Any other manner of nomination required unanimous consent of the members.

At the Society's Annual Meeting on January 19, 1972, attempts by one of the plaintiffs to nominate individuals for the Board of Directors were unsuccessful, as was another plaintiff's attempt to introduce a resolution calling for one-third of the Board membership to be composed of blind representatives.

During the next three months, the Society's clerical employee was instructed to hold letters requesting membership because the Board was considering abolishing membership. Plaintiffs' letters containing dues were placed in a "special file," but the checks were cashed. Refunds were later sent to plaintiffs. No other dues were returned. Anyone else who sent in money became a "Friend of the Society." Within that period, the Society's counsel[1] recommended to the Board's executive committee that Society membership be limited to persons on the Board. He cited as his reasons that many groups with what may be laudable purposes were seeking to control corporations and that it would be irresponsible to have articles and bylaws that permitted a takeover by such groups.

On April 19, 1972, the Board amended the articles of incorporation to provide that only directors of the Board could be members of the Society. The Society's executive director testified that it was the Society's concern that a small group of people with narrow or specialized interests could become members and vote themselves into director positions. The testimony of several Board members attributed the abolition of open membership to concern about takeover of the Society. To the contrary, plaintiffs testified that they had no plans to take over or jeopardize the Society, which had provided services to some of them for many years.

On May 31, 1972, the Society filed with the Secretary of State an amendment passed in 1966 that had shifted the power to amend the articles of incorporation from the membership to the directors.

Plaintiffs commenced this action on September 22, 1972, seeking injunctive relief and compensatory damages of $25,000 for violation of their civil rights. In response, on October 12, 1972, the Board undertook to reconstitute its former membership in order to vote on the issue of abolition of membership by amending its articles and bylaws to reestablish the previous membership provisions as they existed prior to the date of abolition and by establishing by Board resolution new qualifications for membership. As a result, only contributors or members as of September 22, 1972, the date of this action, were eligible.

Plaintiffs moved the district court for a temporary injunction to enjoin the meeting. They also sought an order for production of membership lists to enable them to contact the Society's membership. These motions were denied on December 15, 1972.

On December 18, 1972, a meeting of the reconstituted membership was held. Plaintiff Steven Jacobson, who had paid dues by mail but had not been a member prior to September 22, 1972, was refused admittance. All other plaintiffs who had paid the $5 dues as required by the resolution appeared on the membership list, except Brennan. At the meeting, about two-thirds of the reconstituted membership in attendance voted in favor of restricting membership to the Board. After the meeting, the Society's counsel stated that the restriction was temporary, until a broader, more know-

---

1. References in this opinion to the Society's counsel refer to former counsel and not to counsel of record.

ledgeable membership could be recruited, and indicated that the change was directed at the organized blind.

Trial commenced on January 31, 1977. On June 15, 1977, the trial court held that the Society's actions with respect to membership were unreasonable and enforced unequally against plaintiffs in violation of Minn.St. 317.25. It also held that the State of Minnesota was not so irrevocably interrelated as to make the Society's conduct "state action." The trial court ordered defendant to conduct a new election with open membership, allowing persons to join the Society by payment of $1 on or before election day. Further, the order of the court permitted plaintiffs to express their views to any member by mail at Society expense each time the Society communicated with potential voters. On July 15, 1977, the trial court amended its order to provide in part that directors must be Minnesota residents but that nonresidents could be members. This appeal followed.

1. The first issue concerns the validity of the four amendments to the bylaws which were passed by the Board of Directors on December 15, 1971. The Society Board was vested with the authority to amend bylaws by its original articles of incorporation. However, the exercise of that authority with respect to membership by any non-profit corporation is subject to Minn.St. 317.25.

Minn.St. 317.25, subd. 1(1, 2), provides:

"(1) Subject to clauses (2) and (3), membership in all corporations consists of the classes, and is governed by the rules of admission, retention, suspension, and expulsion, that the articles or bylaws prescribed.

"(2) All such rules shall be reasonable, germane to the purposes of the corporation, and equally enforced as to all members of the same class."

Based on the evidence before it, the trial court held the bylaw amendments were unreasonable, not germane to corporate purposes, and unequally enforced within the meaning of the statute.

■ Only two of the four bylaw changes passed by the Board, the increase in dues from $1 to $5 and empowering the Board to terminate membership for any reason deemed satisfactory to it, fall within Minn.St. 317.25, subd. 1(1) as directly bearing on membership. The other two bylaw amendments, the prohibition of cumulative voting and the establishment of a nomination procedure for the Board, have no apparent relationship to the admission, retention, and expulsion of members. See, Minn.St. 317.25, subd. 1(2). While only bylaws relating to membership are subject to the specific requirements of the statutory provision, all bylaws of a corporation must be fair and reasonable. See, *Bosch v. Meeker Cooperative Light & Power Assn.,* 253 Minn. 77, 91 N.W.2d 148 (1958); *Mooney v. Farmers Mercantile & Elevator Co.,* 138 Minn. 199, 164 N.W. 804 (1917).

Defendant does not purport to have presented evidence at trial establishing the reasonableness or germaneness of any bylaw. According to defendant, the question is the reasonableness of each bylaw provision itself, and that question is not dependent upon the intent behind its enactment. Thus, defendant contends that the trial court's reference to the Board's motives in amending the bylaws was improper.

Some jurisdictions hold that the unreasonableness of a bylaw must clearly appear before a court will declare it unreasonable; in such cases the courts will not look closely into matters of judgment, where there may be a reasonable difference of opinion. See, e. g., *McKee & Company v. First National Bank of San Diego,* 265 F.Supp. 1, 8 (S.D. Cal.1967), affirmed 397 F.2d 248 (9 Cir. 1968); The *People v. Ittner,* 165 Ill.App. 360 (1911). This standard of review was urged upon this court but not adopted in *Bosch v. Meeker Cooperative Light & Power Assn., supra.*

Under the above standard of review not all of defendant's bylaw amendments appear patently unreasonable. The increase of dues from $1 in 1917 to $5 in 1971 is not clearly unreasonable. Furthermore, it is not prima facie unreasonable to prohibit

cumulative voting in light of the statutory authority for such action, see, Minn.St. 317.-22, nor is a strict procedure for nominations for the Board of Directors unreasonable as long as it is fair. See, *Dozier v. Automobile Club of Michigan,* 69 Mich.App. 114, 244 N.W.2d 376 (1976).

The fourth bylaw, granting broad discretion to the Board to terminate memberships for whatever reason it deems satisfactory, seems less than reasonable. However, as defendant argues, the harshness is tempered somewhat by the legal guarantees of notice and a hearing prior to expulsion. See, *Peters v. Minn. Dept. Ladies of Grand Army of Republic,* 239 Minn. 133, 58 N.W.2d 58 (1953); *Strong v. Minneapolis Automobile Trade Assn.,* 151 Minn. 406, 186 N.W. 800 (1922); *Stevens v. Minneapolis F.D.R. Assn.,* 124 Minn. 381, 145 N.W. 35 (1914).

■ Other courts have stated that the reasonableness of bylaws depends upon the particular circumstances. See, e. g., *Highland Park Assn. v. Boseker,* 169 Mich. 4, 135 N.W. 106 (1912). Even though a bylaw seemingly may comply with statutory provisions, it must also be reasonable in its practical application. See, *Haynes v. Annandale Golf Club,* 4 Cal.2d 28, 47 P.2d 470, 99 A.L.R. 1439. It is not the policy of this court to unduly interfere with the internal management of corporations. However, in order to give full effect to the protections established in Minn.St. 317.25 and by this court in *Bosch v. Meeker Cooperative Light & Power Assn., supra,* and *Mooney v. Farmers Mercantile & Elevator Co., supra,* we believe the reasonableness of bylaws may be reviewed as they were applied where an injury is alleged. Consistent with this view, we affirmed the finding of the trial court in *Bosch v. Meeker Light & Power* that a proposed bylaw was invalid because it could be applied in an arbitrary, unreasonable, or unlawful manner. Thus, in the case at hand, the trial court properly received and considered evidence pertaining to the enactment and application of the bylaws. Because the unreasonableness of bylaws is a question of fact, see, *R.E. Townsend Corp. v. Gleaner Life Ins. Society,* 298

Mich. 10, 298 N.W. 385 (1941), the findings of the trier of fact will not be disturbed if the evidence as a whole sustains the findings. See, *Bosch v. Meeker. Cooperative Light & Power Assn., supra.*

■ Here, the trial court in finding the bylaw amendments to be unreasonable stated in its Memorandum:

"When viewed chronologically, it is obvious that each of these actions was taken to bar the critical minority members from gaining additional representation in the Society."

The record supports the trial court's determination. The evidence before the trial court revealed a pervasive concern in the Society over possible takeover of the Board of Directors by a dissident group. Although two Board members testified that they had been concerned about the loose membership policy since the late 1960's, it is apparent from the testimony of these and other directors that plaintiffs' activities precipitated the actions of the Board and that the effect of the bylaws as applied discouraged the efforts of plaintiffs to promote their ideas in a legitimate manner. It cannot be merely a coincidence that the Board decided to pass all four amendments as a group at the time when plaintiffs' dissension was the most intense. Under these facts and circumstances, the bylaw amendments were not reasonable, and the judgment with respect to this issue is affirmed.

■ 2. Defendant next asserts the validity of the amendment to the articles of incorporation restricting voting membership to the Board of Directors, which was passed by the Board on April 19, 1972. Defendant concedes that by oversight the 1966 amendment that authorized the Board to amend the articles was not filed with the Secretary of State's office until May 31, 1972. Until it is recorded by the Secretary of State, an amendment to the articles of incorporation does not take effect. See, Minn.St. 317.27, subd. 5. Consequently, the Board's amendment on April 19, 1972, was without authority and effect.

Defendant would have the statutory provision construed to apply retroactively so that once the amendment was recorded all Board action that preceded the recordation would be validated. Such a construction is not supported by the language of the statute and is inconsistent with the purpose of publicly recording the articles of incorporation and subsequent amendments. The statutory provision setting the time when an amendment takes effect has more than a mere clerical purpose. The requirement that articles of incorporation be made a public record provides a means of furnishing information to those who deal with corporations. See, *Higgins v. Hampshire Products,* 319 Mich. 674, 30 N.W.2d 390, 175 A.L.R. 1083 (1948).

3. We turn next to defendant's argument that any procedural defect in the Board's action amending the articles of incorporation was remedied by the subsequent vote of the reconstituted membership that ratified the Board's action. The issue here is not whether the disenfranchisement of members of a non-profit corporation is legal but whether the reconstitution of the membership, after it had been unlawfully terminated by Board action, was valid.[2]

After the Board purported to terminate the membership by amending the articles of incorporation on April 19, 1972, the customary semiannual solicitations ceased. No memberships were renewed, nor were new members accepted between April 19, 1972, and the time of reconstitution.

In the course of reconstituting membership, the Board took three actions on October 12, 1972. First, it reenacted the membership provision of the articles of incorporation as it existed prior to April 19, 1972.[3] Second, it reenacted the membership provisions of the bylaws as they existed prior to April 19, 1972.[4] Third, it passed a resolution purporting to define the "favorable action" language of Article 3 of the bylaws through a set of three classifications constituting qualifications for membership.[5]

If a person did not fit into one of the three classifications, he was ineligible for membership. Basically, only persons who were already members, who had attempted to become members, or who were contributors, on or before September 22, 1972, the date litigation commenced, qualified for membership.

The trial court found that the membership was reconstituted in a manner that precluded plaintiffs from increasing support for their position in the membership.[6] If the membership meeting was illegal, it would follow that the ratification was ineffective. Cf., *State ex rel. the Anti-Vivisection Society of Ohio, Inc. v. Brandt,* 91 Ohio Abs. 103, 185 N.E.2d 790 (1962) (meeting null and void where notification of mem-

---

2. Minn.St. 317.25, subd. 1(4) unequivocally provides that a nonprofit corporation may have no voting members or may have different classes, including members having no votes. Accordingly, if the articles of incorporation are properly amended to include such a provision, disenfranchisement may occur without violating the rights of members. See, e. g., *Westlake Hospital, Assn. v. Blix,* 13 Ill.2d 183, 148 N.E.2d 471 (1958), appeal dismissed, 358 U.S. 43, 79 S.Ct. 44, 3 L.Ed.2d 43 (1958).

3. Prior to April 19, 1972, Article II of the articles of incorporation, as amended in 1966, defined members in the following manner: " * * * Regular Members, who shall be such persons as pay the annual dues of one dollar ($1.00) to the corporation."

4. Article 3 of the bylaws, as amended in 1956, elaborated the qualifications for membership in the following manner: "(1) Any person may become a member of this corporation upon favorable action of the Board of Directors and payment of annual membership dues in the amount hereafter specified."

5. (1) All members as of December 31, 1971 who contributed at least $5.00 within 20 days of being notified of the October 12, 1972 resolution; (2) All contributors of at least $5.00 prior to September 22, 1972; (3) All persons who tendered in writing at least $1.00 for membership prior to September 22, 1972, and who contributed $5.00 within 20 days of notice of the resolution.

6. It should be noted additionally that any attempts by plaintiffs to contact the eligible Society membership with respect to their positions on termination of open membership were foreclosed, as the Society refused to disclose its membership list even to the plaintiffs who were members.

bers incomplete); *Strong v. Garvey Memorial Liberty Hall*, 380 Pa. 236, 110 A.2d 244 (1955) (resolution to dissolve invalid where notification of members defective).

Other courts have restricted the discretion of non-profit corporations in admitting members to the qualifications set forth in the articles and bylaws. In *Porterfield v. Black Bill & Doney Parks Water Users' Assn.*, 69 Ariz. 110, 210 P.2d 335 (1949), the court in reviewing the rejection of applicants to a non-profit corporation held that where the articles of incorporation and the bylaws set up the standard by which the eligibility of an applicant shall be determined, the Board of Directors' authority is merely to determine whether the applicant meets that standard. If he does, it is mandatory upon the Board to admit him to membership. 69 Ariz. 115, 210 P.2d 339. Accord, *Meyers v. Lux*, 76 S.D. 182, 75 N.W.2d 533 (1956).

Under Minnesota law, admission of members is to be governed by rules set forth in the articles and bylaws. See, Minn.St. 317.-25, subd. 1(1). The sole qualification for membership set forth in the Society's articles was payment of dues in the amount of one dollar. The bylaws additionally required favorable action by the Board of Directors; however, this provision would appear to be merely procedural rather than a qualification for membership.[7] If plaintiffs paid the required dues, the Society was obligated to admit them.

■ Defendant has presented no authority for exclusion of membership applicants under additional qualifications passed by resolution of the Board. Minn.St. 317.25, subd. 1(1) does not permit membership admission to be controlled by resolution. A resolution is not a bylaw; it is an informal enactment of a temporary nature providing for the disposition of certain administrative business of the corporation. See, *Common-*

wealth v. Bitner*, 294 Pa. 549, 555, 144 A. 733, 735 (1929); Oleck, Non-profit Corporations, Organizations, and Associations (3rd ed. 1975) § 137. In contrast, bylaws are the laws adopted by the corporation for the regulation of its actions and the rights and duties of its members. See, *Diedrick v. Helm*, 217 Minn. 483, 14 N.W.2d 913, 153 A.L.R. 649 (1949). It is well established that the directors are bound to follow the bylaws. See, *Bosch v. Meeker Cooperative Light & Power Assn., supra.*

■ But for the resolution that determined eligibility, persons including plaintiff Jacobson could have joined the Society pursuant to the bylaws and articles between the cut-off date, September 22, 1972, and the date of the meeting, December 18, 1972. Because the resolution improperly altered the Society's membership, the December 18th meeting of that membership was illegal, and the actions taken there were void.

Defendant argues that, even if the reconstitution is found unlawful, a sufficient number of legitimate votes was cast to pass the amendment. This argument is based on the erroneous assumption that an illegal constitution of membership does not render ineffective the action of those members. Furthermore, the trial court made no finding, nor is it readily apparent from the record, as to which votes were illegal. Neither party knows how the votes were cast; their arguments are predicated upon the best guesses of defendant's counsel.

4. Defendant's final contention is that the trial court's order in effect improperly precludes the present Board from exercising its power to amend the articles granted by the 1966 articles of incorporation, now properly filed with the Secretary of State. Indeed, for the trial court's order, which establishes conditions for the new election by the membership, to have effect, an ac-

---

7. To construe the provision otherwise would mean the Board could deny membership simply by withholding action, even though the substantive qualification set forth in the articles and bylaws was met. It is questionable whether the statutory requirements of reasonableness, equal enforcement, and germaneness would then be satisfied if "favorable action" were a substantive qualification for membership. Cf., *Falcone v. Middlesex County Medical Society*, 34 N.J. 582, 597, 170 A.2d 791, 799, 89 A.L.R.2d 952, 963 (1961) (power to exclude an applicant subject to constraints of reasonableness and the public interest).

tion by the Board to terminate that membership prior to the election must be presumed to be implicitly enjoined.

 The trial court does have equity jurisdiction over the affairs of a corporation where illegality is proved. See, e. g., *Warner v. E. C. Warner Co.*, 226 Minn. 565, 33 N.W.2d 721 (1948). The California Court of Appeals has determined that a trial court may order a specific electoral plan for a non-profit corporation where the prior selection of directors was unfair and unlawful. See, *Braude v. Havenner*, 38 Cal. App.3d 526, 113 Cal.Rptr. 386 (1974). Accord, *Prickett v. American Steel and Pump Corporation*, 253 A.2d 86 (Del.Ch.1969). But see, *Chew v. Inverness Mgt. Corporation*, 352 A.2d 426 (Del.Ch.1976).

 Under these circumstances, the trial court's broad exercise of its jurisdiction is not unreasonable. The trial court determined that plaintiffs' cause of action arose on December 15, 1971, when the bylaws were amended in violation of Minn.St. 317.-25, so that plaintiffs were subsequently barred from effective participation in the Society. The trial court reasoned that while a new election of the Board was necessary to ensure plaintiff's right to participate, the policies stricken by the trial court could be reinstated after the election, if desired.

We agree that plaintiffs' primary objective in this action is to enforce their right to participate in the Society's electoral process. No matter how unpopular plaintiffs' views may be with the Society's current Board of Directors, plaintiffs had the right on December 15, 1971, to participate in a fair, open election. Once this right is exercised under the provisions established by the trial

court, however, the newly elected Board of Directors will be free to adopt membership policies as it deems suitable.

5. The final issue before this court is one of considerable difficulty and significance. Plaintiffs challenge the trial court's finding of no state action, which precluded them from proving claims of constitutional violations and damages under the Civil Rights Act, 42 U.S.C.A. § 1983.

 The state action requirement may be satisfied even though the actor is a private entity if the conduct that is formally private has become so entwined with governmental character as to become subject to the constitutional limitations placed upon state action. See, *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). But it is only by sifting facts and weighing circumstances that the nonobvious involvement of the state in private conduct can be accorded its true significance. *Burton v. Wilmington Pkg. Authority*, 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45, 52 (1961).[8]

Plaintiffs argue that the facts and circumstances of this case support a finding of state action, emphasizing the governmental function performed by the Society, the mutual benefits conferred by the Society's relationship with the state, and the absence of a legitimate claim to a private status. Plaintiffs do not dispute the trial court's findings of fact, only the standard applied and the legal conclusion drawn.

From its findings, the trial court inferred that "the State of Minnesota is not so irrevocably inter-related with the Minneapolis Society for the Blind, Inc., as to make conduct by the Society 'state action.'" In reaching this conclusion, the trial court re-

---

**8.** State action was obvious in *An Unborn Child, by Wilcox v. Evans*, 310 Minn. 197, 245 N.W.2d 600 (1976), which involved an equal protection action not under 42 U.S.C.A. § 1983. In *Evans*, the statutorily created State Employees Insurance Benefit Board (SEIB) negotiated life insurance protections for state employees with insurers who proposed a contract which discriminated between the legitimate and illegitimate children of the insured. Because SEIB's execution of the contract had the effect of authoriz-

ing and requiring discrimination, we held that the act of executing the contract constituted state action, citing *Burton v. Wilmington Pkg. Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Until the instant case, however, we have not had to "wade into the murky waters of the state action doctrine" quite so deeply. See, *Jackson v. Statler Foundation*, 496 F.2d 623, 626 (2 Cir. 1973), certiorari denied, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1974).

lied heavily on the absence of a nexus between the State of Minnesota and the challenged activity, stating that if the plaintiffs could establish joint participation of the Society and the state in the challenged activity, it would have very little difficulty finding state action.

■■■ While the trial court is not alone in requiring proof of such a nexus in its state action analysis,[9] see, e. g., *Junior Chamber of C. of K. C., Mo. v. Missouri St. J. C. of C.*, 508 F.2d 1031 (8 Cir. 1975) (Heaney, J., dissenting), we are persuaded by the reasoning of many courts that state action may be established either under the "sufficiently close nexus" test of *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), or, in the absence of a nexus, under the symbiotic relationship test illustrated by *Burton v. Wilmington Pkg. Authority, supra.* See, *Benner v. Oswald*, 592 F.2d 174 (3 Cir. 1979); *Downs v. Sawtelle*, 574 F.2d 1 (1 Cir. 1978), certiorari denied, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1978); *Chalfant v. Wilmington Institute*, 574 F.2d 739 (3 Cir. 1978); *Braden v. University of Pittsburgh*, 552 F.2d 948 (3 Cir. 1977); *Holodnak v. Avco Corp.*, 514 F.2d 285 (2 Cir. 1975), certiorari denied, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 173 (1975); *New York City Jaycees, Inc. v. United States Jaycees, Inc.*, 512 F.2d 856 (2 Cir. 1975); *Janusaitis v. Middlebury Volunteer Fire Dept.*, 464 F.Supp. 288 (D.Conn. 1979); *Johnson v. Southwest Detroit Community Mental Health Services*, 462 F.Supp. 166 (E.D.Mich.1978), *Milner v. National School of Health Technology*, 409 F.Supp. 1389 (E.D.Penn.1976).

In *Burton*, the Wilmington Parking Authority, the state actor, operated and maintained a public facility, part of which was leased to a private party for the purpose of operating a restaurant that refused to serve black people. The Supreme Court focused on the lease relationship between the state actor and the private party: the restaurant was located in a publicly owned and operated facility built on land condemned by the state for public use; the upkeep and maintenance of the building were responsibilities of the state authority and were to be paid by public funds; under the terms of the lease the state was to provide all utilities; and the restaurant, as well as the other commercial establishments in the building, was an integral part of the authority's plan to operate a self-sustaining project. See, 365 U.S. 722–24, 81 S.Ct. 860–61, 6 L.Ed.2d 50–52. Moreover, the authority benefited from the restaurant's racial discrimination, for it was agreed that serving black people in that community would have adversely affected the profitability of the restaurant's business. From these facts, the mutually beneficial relationship, and the public ownership of the facility, the court concluded that "[t]he State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." 365 U.S. 725, 81 S.Ct. 862, 6 L.Ed.2d 52.

*Burton* was distinguished in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), which involved an action that arose from the refusal of a certain local chapter of the Moose Lodge to extend membership to a black man. The plaintiff there attempted to predicate state action upon the liquor licensing arrangement between the private club and the Pennsylvania Liquor Control Board. The court found that the symbiotic relationship that was present in *Burton* was absent in *Moose Lodge*. Unlike the Eagle Restaurant in *Burton*, the *Moose Lodge* owned its building and land; it held itself out as a private club, not as a public accommodation; it did not discharge a function or perform a service that would otherwise in all likelihood be performed by the state. 407 U.S. 175, 92 S.Ct. 1972, 32 L.Ed.2d 638.

9. We note the trial court's reliance on *Jackson v. Statler Foundation*, 496 F.2d 623 (2 Cir. 1973). The court held there, however, that "[t]he formulation of this definition of 'state action' is applicable only to claims of racial discrimination." Id. at 635.

Furthermore, the court concluded that regulation by the state did not sufficiently implicate the state in the discriminatory policies, although it recognized that state action may emanate from rulings of administrative and regulatory agencies. 407 U.S. 179, 92 S.Ct. 1974, 32 L.Ed.2d 641.

The distinction between *Burton* and *Moose Lodge* was discussed in *Gilmore v. City of Montgomery*, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974), where it was charged that the city permitted the use of city recreational facilities by racially segregated private schools or other organizations. The *Gilmore* court construed its holding in *Moose Lodge* to be that there was "no state action in the mere fact that the fraternal organization's beverage bar was licensed and regulated by the State." 417 U.S. 573, 94 S.Ct. 2426, 41 L.Ed.2d 319. The court contrasted *Burton*, stating that the question of "the existence of state action center[ed] in the extent of the city's involvement in discriminatory actions by private agencies using public facilities, and in whether that involvement makes the city 'a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.'" Id., quoting *Burton*. The court observed that the *Gilmore* fact situation was more like *Burton* than like *Moose Lodge* because private use of public property was at issue, and that the determinative question, then, was whether there was significant state involvement in the alleged private discrimination. Id.

Later in 1974, the court decided *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Plaintiff Jackson sought damages and injunctive relief under 42 U.S.C.A. § 1983 against the private utility corporation for termination of her electric service allegedly before she had been afforded notice, a hearing, and an opportunity to pay. Citing *Moose Lodge*, the court first decided that extensive and detailed state regulation imposed upon the utility did not constitute state action; rather that the essential inquiry was "whether there is a sufficiently close nexus between the State and the *challenged action* of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." (Emphasis supplied.) 419 U.S. 351, 95 S.Ct. 453, 42 L.Ed.2d 484.

*Burton* was not overruled but was distinguished. The Court rejected plaintiff's arguments that her case fell on the "*Burton* side of the line," rather than on the "*Moose Lodge* side of that line," 419 U.S. 351, 95 S.Ct. 454, 42 L.Ed.2d 484, on the basis that no symbiotic relationship was present as in *Burton*. The court further noted that the holding in *Burton* had been limited to lessees of public property. 419 U.S. 358, 95 S.Ct. 457, 42 L.Ed.2d 488.

This line of cases persuades us that state action may be found either where a sufficiently close nexus exists between the state and the challenged activity or where a *Burton*-type symbiotic relationship is present.

We agree with the trial court in the instant case that there was not a sufficiently close nexus between the State of Minnesota and the internal membership policies and procedures of the Society. Because the primary interest of the state was the delivery of services to its referrals, the state manifested little interest in the unrelated corporate operation of the Society. The most intrusive measure into the Society's internal activities was the imposition of a grant condition in 1971 that efforts be made to place consumer representatives on the Board of Directors. The facts show no other intervention by the state into the area of membership policies and procedures, and certainly no state involvement in the specific challenged activities. Under these circumstances, we do not find the imposition of the grant condition, which in and of itself is not challenged, to constitute in this case the nexus required by *Jackson, supra*.

Our inquiry does not stop there, however. We must consider next the interdependence or symbiosis alleged to be present in the relationship between the State of Minnesota and the Society. The facts do reveal extensive interaction through funding, referrals, and regulation, and a high level of

interdependence arising from the specialized nature and limited availability of the services. We cannot ignore the state's statutorily-mandated involvement in securing such services,[10] although these services do not rise to the level of being a public function that has been exclusively and traditionally reserved to the state, such as elections and necessary municipal functions. See, *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). While the state's responsibility is to "endeavor to secure" services for the blind, it is not expressly obligated to provide them, nor has it in any way attempted to discourage or preclude the involvement of private parties in vocational training and rehabilitation programs. Thus, if state action is to be found in the case at hand, it must be predicated upon the strength of the facts which evidence the interrelationship between the Society and the state. The *Burton* case, of course, provides the framework for this analysis, and we study it carefully to determine which factors in the not uncommon state-private relationships carry great weight.

The predominant consideration in *Burton*, and seemingly the most objectionable fact, was the role of public property in the private venture. The court stated:

"Addition of all these activities, obligations and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn." 365 U.S. 724, 81 S.Ct. 861, 6 L.Ed.2d 51.

Prescient of the growing entanglement of state and private enterprises as a means of achieving governmental objectives, the court limited the application of *Burton*:

"Because readily applicable formulae may not be fashioned, the conclusions drawn from the facts and circumstances of this record are by no means declared as universal truths on the basis of which every state leasing agreement is to be tested. Owing to the very 'largeness' of government, a multitude of relationships might appear to some to fall within the Amendment's embrace, but that, it must be remembered, can be determined only in the framework of the peculiar facts or circumstances present. Therefore respondents' prophecy of nigh universal application of a constitutional precept so peculiarly dependent for its invocation upon appropriate facts fails to take into account '[d]ifferences in circumstances [which] beget appropriate differences in law,' (citation omitted). Specifically defining the limits of our inquiry, what we hold today is that when a State leases public property in the manner and for the purpose shown to have been the case here, the proscriptions of the Fourteenth Amendment must be complied with by the lessee as certainly as though they were binding covenants written into the agreement itself." 365 U.S. 725, 81 S.Ct. 862, 6 L.Ed.2d 52.

While we do not believe that *Burton* is applicable only to a lease relationship, more is required to constitute state action than the involvement of state funds or state regulations. To hold otherwise would be to unbalance the complementary principles which emerge in state action cases: (1) the right of private individuals to associate

10. Minn.St. 248.07. subd. 4 provides:

"The commissioner of public welfare shall endeavor to secure for the adult blind of the state and youths of legal working age such vocational training, labor, and employment as may be adapted to their respective capacity, and shall so far as may be feasible aid such persons in securing any provisions which may be made by the school for the blind or other state agencies for the betterment of their lot.

When vocational training under the division of vocational rehabilitation is secured, such aid may take the form of payments for maintenance of persons in training, under rules to be adopted by the commissioner of public welfare. Any person who shall be entitled to training under this subdivision shall have the right to choose from available programs such training as in his opinion would be suitable and practical for him."

with whomever they choose and to engage in various activities of a free citizenry without concern for federally imposed constitutional restrictions; and (2) the constitutional ban on state-sponsored impairment of individuals' rights to due process and equal protection. Note, 81 Dickinson L.Rev. 315, 343, citing *Evans v. Newton, supra,* 382 U.S. at 298, 86 S.Ct. 488, 15 L.Ed.2d 377. These principles are best accommodated by exercising caution in a state action analysis.

The facts alleged to constitute a symbiosis must indeed convince us that the "power, property, and prestige" of the state has been in fact placed behind the discriminatory conduct. *Burton v. Wilmington Pkg. Authority, supra,* 365 U.S. at 725, 81 S.Ct. 862, 6 L.Ed.2d 52. We are not so convinced by the case before us.

The State of Minnesota lays no present claim to the land, buildings and equipment of the Society. In fact, the trial court found that less than one-half of the Society's recent expansion and improvement used public funds, although the state was allowed to provide 80 percent. Nor is this a case where significant public funds or the services they procure are being provided discriminatorily or denied to those eligible. The public resources are being used for their intended purpose, and the state's primary interest in securing uninterrupted, quality rehabilitative and training services to its referrals is fulfilled.

Furthermore, unlike *Burton,* any benefits that are mutually conferred upon the Society and the state are wholly unrelated to the conduct alleged to be constitutionally infirm. While the very essence of the state-private relationship in *Burton,* that is the service of customers, was the source of discrimination, the basis of the involvement of the State of Minnesota with the Society, which is the providing of vocational training, does not, by contrast, contribute to the controversy before us.

Affirmed.

OTIS, J., took no part in the consideration or decision of this case.