473 So.2d 402 (1985)
Grover ALLGOOD, et al., [Presbyterian Church of America, of Columbus, Ms.]
v.
Mrs. Irwin BRADFORD, et al., [Palmer Home for Children].
No. 54810.
Supreme Court of Mississippi.
July 10, 1985.
*403 L.F. Sams, Jr., Mitchell, McNutt, Bush, Lagrone & Sams, Tupelo, for appellants.
Roy D. Campbell, Jr., Campbell & DeLong, Greenville, for appellees.
Before ROY NOBLE LEE, P.J., and HAWKINS and SULLIVAN, JJ.
*404 SULLIVAN, Justice, for the Court:

I.
The estrangement in the early 1980's between a Columbus, Mississippi, church and an orphanage presents this Court with the task of reviewing their 90-year relationship to determine who are the "members" of the orphanage, a non-profit corporation, who must approve amendments to the corporate charter  the officers of the church, or the board of trustees of the orphanage. Our decision is guided by the statutes, the charters, by fundamental legal differences between business, non-profit and charitable corporations and the exercise of the rights of membership thereof. It should not be read as an endorsement of the prevailing parties', or disparagement of the non-prevailing parties', ability and commitment to fulfill the admirable charitable goals of the orphanage which until recently both have cooperated to achieve.
This action originated when appellees, trustees of Palmer Home for Children, a non-profit corporation, filed suit for declaratory and injunctive relief to determine which of two amendments to the Palmer corporate charter was valid.
In 1981, appellees, Trustees of Palmer Home for Children, a Mississippi non-profit corporation, amended the Palmer charter to take out a provision granting to appellants, Officers of the Presbyterian Church of Columbus, the right to elect the Palmer trustees. Also taken out was a provision that the trustees held the Palmer assets in trust for the benefit of the Columbus church. In response, appellants, the governing body of the church, amended the Palmer charter in 1982 to reinstate the election and trust provisions. Appellants elected a new board of trustees and took steps to oust the appellees and take over management and control of Palmer Home for Children.
Appellees then filed an action in the Chancery Court of Lowndes County to declare the 1981 charter valid and the 1982 charter void, and to enjoin the appellants from interfering with the operation of Palmer Home. Appellants' answer asserted that the 1981 charter unlawfully revoked the trust relationship and right to elect trustees that had been recognized in all pre-1981 Palmer charters. Appellants asked the court to declare valid the 1982 charter which restored these provisions, and to rule that the appellants were the lawful trustees of Palmer.
After a two-day trial, the court rendered an opinion in favor of the appellees. The chancellor ruled that the appellees, as members of the Palmer Board of Trustees, possessed the authority to amend the corporate charter. The chancellor also found that the appellees were such members as contemplated by statute who must certify a resolution for an amendment to the corporate charter. The chancellor ruled that the 1981 charter was valid and the appellees were the lawful trustees of Palmer. The 1982 charter was held to be void and the appellants not the legal trustees. The chancellor enjoined the defendants from interfering in any way with the appellees' performance of their duties to Palmer. The appellants' counterclaim was dismissed.
On appeal, the appellants assert the chancellor erred in:
A. Ruling that they were not the members of the Palmer corporation as contemplated by statute;
B. Upholding the 1981 charter which divested appellants of voting rights without their consent;
C. Upholding the 1981 charter although it divests the church of an equitable interest as a beneficiary of an express trust;
D. Failing to sustain appellants' counterclaim for breach of contract;
E. Failure to estop the appellees from denying the appellants' authority to elect trustees; and
F. Refusing to admit into evidence a written history under the "ancient document" exception to the hearsay rule.

*405 II.

FACTS

a. Parties
The First Presbyterian Church of Columbus, Mississippi, was incorporated by act of February 8, 1838 (1838 Miss. Laws at 107-08). After the Civil War, the church became part of the Presbyterian Church in the United States (PCUS). The organization of the Presbyterian Church consists of a series of hierarchical church courts. The four echelons are (1) the Session at the local church level; (2) the Presbytery covering a designated geographical area and a number of local churches; (3) the Synod, including a larger geographical area, and a number of Presbyteries; and (4) the General Assembly, embracing all Synods.
Doctrinal differences which arose in 1970 within PCUS resulted in a permanent division of what had been "the First Presbyterian Church in Columbus", affiliated with PCUS. In a compromise agreement, the dissident majority retained the legal entity incorporated by act of the legislature in 1838, and became affiliated with the Presbyterian Church in America (PCA). The minority, loyal to PCUS, conveyed its interest in certain real and personal property to the majority, and took the name "First Presbyterian Church U.S. of Columbus." The appellants are the members of the Session of the First Presbyterian Church of Columbus (PCA).
By a charter dated 1895, the Palmer Orphanage, renamed Palmer Home for Children in 1977, was brought into being as a corporation whose original purpose was "to support, rear, train, discipline, maintain and educate white orphans, or children of reputable parents, one of whom is dead." Palmer Home is located on the southern edge of Columbus on a 120-acre tract, with six cottages, a large administration building, a director's residence, a gymnasium, and other outbuildings. In 1982, Palmer Home took in over $650,000 in contributions from churches and individuals. The appellees are the trustees of Palmer Home for Children, all of whom have been elected and serving as trustees prior to 1981.

b. Origin of Palmer Home
On July 17, 1894, the Session of the Columbus church approved the suggestion of their pastor to establish an orphanage within the bounds of the Synod and resolved to aid in promoting the enterprise. The next day, the elders and deacons agreed to cooperate.
The preliminary minutes for August 31, 1894, showed that the following resolution was adopted:
RESOLVED: That we, the elders, deacons, and trustees of the Columbus Presbyterian Church whose names are hereunto signed hereby organize ourselves into a board of trustees to found an orphanage in the city of Columbus, Mississippi.
The preliminary minutes reflect the solicitation of community wide efforts to raise funds involving committees of other local churches, including Cumberland Presbyterian, Methodist, Baptist, Christian, Episcopal, and Catholic churches, the Jewish Synagogue, and persons who were not members of any church.
The Palmer Orphanage charter of incorporation approved March 12, 1895, contains in section 1 the above-quoted purpose for creation. Section two names eighteen persons as the incorporators. Section three is a general powers provision granting rulemaking power and the power to acquire or dispose of rights in the corporation. No provision defines who are the members of the corporation or how trustees are to be elected.
In 1897, the first of fifteen conveyances of land to the Palmer Home was made. The grantee in each instance is the corporation Palmer Orphanage, except in two 1961 deeds where the grantees are listed as certain named trustees for Palmer Orphanage, and their successors in office.

c. Expansion
By 1902, Palmer Orphanage was in financial straits. The minutes of May 19, 1902, reflect that the Palmer trustees resolved *406 to tender the orphanage to the Synod of Mississippi, upon condition that it not be removed from Columbus as long as it is an orphanage. A committee was appointed to meet with the Synod and report to the trustees after the meeting.
The November, 1902, minutes of the Synod of Mississippi, held in Columbus, report that the Palmer board of trustees submitted and the Synod accepted the following proposal:
The Palmer Orphanage agrees, in consideration that the Synod of Mississippi will assume the responsibility incident to the support, maintenance and perpetuity of the Palmer Orphanage in all the purposes aims and hopes of said Orphanage to sell; transfer and convey to the Synod of Mississippi an undivided two-thirds interest in and to all the real and personal property owned by said Palmer Orphanage, with the real and personal property owned by said Palmer Orphanage, with the right on the part of the Synod to elect six Trustees; the officers of the First Presbyterian Church of Columbus, Miss. (Elders, Deacons and Trustees), in joint session shall elect three Trustees; these creating a Board of nine Trustees, in whom will be vested all the necessary powers for controlling, managing, guiding and governing the said Orphanage, its properties, real and personal, and its officers, and internal affairs in all its ramification and detail.
The First Presbyterian Church of Columbus, Miss., is to retain the remaining undivided one-third interest, together with the right to elect as aforesaid one-third of said Board of Trustees; with the further reservation and restriction accompanying the grant of said two-thirds interest that the site of the Palmer Orphanage shall not be removed from the city of Columbus, unless it shall be with the unanimous consent of the three Trustees who may be on the Board of Trustees representing the said church who may be chosen as aforesaid, if the number of Trustees shall hereafter be increased above the number nine as specified.
The November 24, 1902, minutes of the Palmer board of trustees reflect that an amended charter was read and adopted by vote. Three trustees were also elected.
As a result of the foregoing action by the Palmer board of trustees, the 1903 amended charter was adopted. Section two provided that the Mississippi Synod had designated six, and the Columbus church three, trustees. Section three provided that three trustees per year shall be reelected, two by the Synod and one by Columbus church. Section four provided that the trustees shall hold and manage all property in trust for the use and benefit of the Synod of Mississippi and the Columbus church, with the power to convey any of the property dependent upon consent of both parties.
At the first meeting of the new board of trustees under the 1903 charter, a committee was appointed to determine whether the Palmer property was in the name of the individual corporators or of the corporation. The committee reported to the board of trustees that it found the property of the Palmer Orphanage was in the name of the corporation.
Palmer Orphanage also solicited the aid of the Louisiana Synod. About the same time that the board of trustees presented its proposal to the Mississippi Synod, it sent a statement of condition of the orphanage to the Louisiana Synod. In November, 1903, the trustees adopted a resolution asking the Mississippi Synod "to adopt such measures as the Synod may deem best to continue and enlarge the interest of the Synod of Louisiana in the work of the Palmer Orphanage." The November, 1905, minutes of the Palmer trustees reflect that a committee was appointed to learn what action the Synod of Louisiana took about accepting an interest in the Palmer Orphanage, and, if they did so, to take steps to have the charter changed so as to provide for another trustee. By 1949, without charter amendment, the Louisiana Synod was represented by three trustees.
In 1945, a charter of incorporation was submitted to avoid expiration of the 50-year *407 period of existence of Palmer authorized by the original charter and then-controlling Mississippi statutes. This charter has neither the election nor trust provisions of the 1903 charter. The charter included a copy of the resolution of the Synod approving it.
The trustees' report to the Synod of Mississippi in September, 1949, recognized that the Synod of Louisiana had given free support to the orphanage over the years and was generally viewed as having a voice in the control of the orphanage. The report stated that the support had not been formalized by an amendment to the charter to provide for the right to elect trustees by the Synod of Louisiana nor to convey to it any fraction of the two-thirds interest in the property held by the Synod of Mississippi.
As a result, a 1950 amended charter was adopted. Section five stated that ownership of the corporation is vested in a 9-member board of trustees who shall hold the property in trust for the use and benefit of the two Synods and the Columbus church for child care purposes. Section seven provided that three trustees per year shall be elected, one each by the two Synods and one by the Session of the Columbus church. Section nine provided that the right of the corporation through its trustees to make rules, laws and regulations was to be exercised with the advice and consent of the three sponsors. Section ten incorporated into the charter the proposal made by the Palmer trustees to the Mississippi Synod in 1902, including the veto provision and the conveyance to the Mississippi Synod of a two-thirds interest, with a retention of a one-third interest in the Columbus church.
Accompanying the 1950 charter were resolutions of the Synod of Mississippi and the board of trustees of Palmer Orphanage approving the adoption of the amended charter.
The Palmer charter was amended in 1954 to increase the membership of the board of trustees from nine to fifteen, with the three supporting institutions each having the right to elect five trustees. This amendment was accompanied by resolution from the board of trustees of Palmer Orphanage, the Synod of Mississippi, the Synod of Louisiana, and the Session of the Columbus church.

d. Withdrawal of Synods
In 1948 the Mississippi Synod appointed a committee to study the conditions and needs of the Palmer Orphanage and develop a plan for building and repair programs. In August and September, 1954, the committee recommended to the Synod that Palmer be rebuilt on its same site on condition that the Columbus church relinquish its charter rights. A minority of the committee recommended that Palmer be rebuilt at a more central location upon the same conditions.
In November, 1954, the church presented the Synod with a resolution rejecting the committee proposals. The church asserted that the veto power reserved to its trustees was limited to removal of the orphanage, and the church itself had no control nor sought same over the operations of the institution. The Synod created a committee to study the matter and present a proposal in 1955.
In June, 1955, the committee report adopted by the Mississippi Synod stated as follows: The basis for dissatisfaction was the imbalance between the Columbus church's support and its control over the institution. The committee sought to persuade the church to relinquish its charter powers. The church Session proposed the surrender of its charter rights upon condition that, (1) the facility not be moved from Columbus for 25 years, (2) if closed or moved, the church would receive 1/3rd share of the property and assets, (3) no lien or transfer of the property was to be made without consent of the church. The Synod rejected the Session's proposal on the position that the only basis for rebuilding in Columbus was the unconditional surrender of the church's charter rights. The Session rejected this counter-proposal. The Synod resolved to relinquish title and representation on the Palmer board and to liquidate its interest and discontinue support to *408 Palmer Orphanage. A committee was appointed to liquidate the Synod's interest.
In December, 1955, the committee reported the results of negotiations between the Synod and Columbus church. Total assets of the orphanage exceeded $300,000. The Synods offered to relinquish their two-thirds interest in the orphanage for (1) $75,000 jointly and 2/3rds of the land not including the original plant site, or (2) $100,000 jointly, representing 1/3rd of the total assets for their 2/3rds interest in the orphanage. The church's counter-proposal refused to recognize that the Synods had any interest in Palmer Orphanage, but offered $40,000 jointly in return for a deed of conveyance.
The Synods continued liquidation negotiations with a view towards arbitration or referral to the trustees for liquidation of the corporation. Meanwhile, in February 1956, the church publicly announced that it had assumed full control of Palmer and ousted the Synods' trustees. While the committee was convinced that the church's action had no legal basis, it refused to engage in a public dispute, seeking instead to reach a negotiated solution. Proposals made by the church were rejected by the committee as a continuation of church domination of the institution out of proportion to its support.
The committee concluded that although the Synods' legal position was sound, liquidation would adversely affect the primary beneficiaries of the corporation, the orphans. Public litigation between a Synod and a constituent church was considered undesirable. The Synod expressly condemned "the acts and the attitude of the Columbus church", but refused to continue a dispute over property rights. The Synod resolved to convey its interest to the church and to recommend that the Louisiana Synod do likewise.
In October, 1956, the Mississippi Synod conveyed its interest in all property of Palmer Orphanage corporation to the Columbus church, upon the condition that if the property ceases to be used as an orphanage, then the Synod shall receive a 1/3rd interest in the property or proceeds from sale.
The Synod of Louisiana withdrew its support without making a corresponding conveyance of its 1/3rd interest in the Palmer Orphanage corporation.
For the next nine years, the board of trustees for Palmer Orphanage was chosen by the Columbus church.
The Palmer charter was amended in 1965 by a resolution of the Palmer board of trustees alone. Section eight eliminated any reference to the two Synods, provided for election of trustees by the elders, deacons and trustees of the Columbus church from among Presbyterian laymen in Mississippi and surrounding states, and required that only 1/3rd of the trustees had to be members of the Columbus church. Section ten vested all corporate powers including the rulemaking power in its trustees; previously the rulemaking power was subject to the advice and consent of the Synods and the Columbus Church. Section eleven forbade removal of Palmer from Columbus except upon written approval of all members of the board of trustees.

e. Schism within Columbus Church
In 1973 doctrinal differences split the congregation of the Columbus church. The dissident majority [appellants] severed its ties with the PCUS and affiliated with PCA, while the PCUS minority elected to establish a separate church in Columbus. In 1974 the parties formalized this split by a compromise and partition deed. The PCA majority retained the church building and the church corporation created in 1838. The PCUS minority received certain real and personal property, but conveyed to the PCA majority inter alia, "all right, title and interest ... in and to Palmer Orphanage ... and all of its property," real and personal and all "rights, title, interests, claims and privileges ... under the corporate charter of Palmer Orphanage, as amended."
In July, 1976, the Palmer board of trustees, eleven of twelve of whom are appellees herein, adopted amendments to the *409 1965 charter, which became the 1977 charter amendments. Among these were a provision for trustees to be elected by the elders of the Columbus church, instead of by the elders, deacons and trustees of the church. Section eight eliminated the 1965 requirement that 1/3 of the trustees be members of the Columbus church. In its place, the trustees substituted the requirement that 1/3 of the trustees shall be members of one of the Lowndes County Presbyterian churches, with membership divided as equally as possible between members of PCA and PCUS. Finally, the corporate purpose was amended to provide for destitute or needy children, instead of destitute white children of reputable parents. Attached to these amendments filed with the Secretary of State was a resolution of adoption by the Palmer Board of Trustees alone.

f. Origin of litigation
In the late 1970's, cooperation between the appellant church and the appellee board of trustees began to break down. The appellant Session voted to hold separate Sunday School meetings for the Palmer children and the "town" children in 1979, but this action was rescinded. After 1978, the board of trustees stopped submitting names of proposed trustees for approval by the Session. By 1980-81, a number of the officers, elders and deacons, including six members of the Palmer board of trustees, resigned or withdrew from participation in the affairs of the appellant church. The trustees were dissatisfied with the youth program offered to the Palmer children by the Columbus church and authorized attendance of other services for the Palmer staff and children. The Session viewed this action as a violation of attendance requirements and appointed a committee to study the legal relationship of Palmer Home to the church.
Rev. Robert Penny, pastor of appellant church, met with Jack Forbus, chairman of appellee board, in September, 1980, to discuss non-compliance with the nomination and attendance requirements. Forbus testified that Rev. Penny told him that the church Session was considering electing trustees of its own choice. Penny denied this, but admitted that he told Forbus that he did not know whether the Session would ratify or deny the board's nominations. Appellee trustee William Webb recalled a similar conversation with Rev. Penny in the summer of 1980, but Rev. Penny could not recall such a discussion. Another source of difficulty was that the church wanted the executive director of Palmer Home, Joe Mitchell, fired, while the appellees wanted to retain him.
In January, 1981, an amended charter was presented and approved by the appellee board. The 1981 amended charter made changes in sections 7 and 8, which are the basis for this lawsuit. Section 7 of the 1981 amendments eliminated the underscored words contained in the 1977 charter:
These trustees shall own, hold and manage all property, real and personal, of every kind, character and amount, owned and possessed by the corporation, in trust for the use and benefit of the Presbyterian Church, Presbyterian Church of America, of Columbus, Mississippi, in the field of child care and related matters and for the purposes stated in section 6 aforesaid.
Section 8 of the 1977 charter provided that the trustees shall be elected at "a regular convened meeting of the elders" of the appellant church. The 1981 charter amended section 8 to read:
The trustees of Palmer Home for Children shall be elected by the board of trustees of the corporation.... No church or other ecclesiastical body must consent or concur in the selection of trustees and the board shall have the exclusive authority to determine, appoint and maintain the trustees required for the operation of the corporation.
This amended charter was accompanied by a resolution of approval by the appellee board of trustees. This document identically follows the original minutes in reporting that a motion was made and seconded that amendments be accepted. However, the original minutes state, "Motion passed *410 unanimously" while the minutes attached to the amended charter instead read as follows:
"Be It Resolved:
 members and the
By the/ Board of Trustees of Palmer Home for Children, a corporation, of Columbus, Mississippi, now assembled, that the existing Charter of Incorporation of said Palmer Home for Children, including all amendments thereto, shall be amended to read and be as follows, to-wit:
The original minutes did not contain the resolution reproduced above, and the words "members and the" were clearly inserted after the document was originally typed.
Following approval of the charter by the governor, the board of trustees did not record the charter in the Lowndes County Chancery Court, but established a committee to negotiate with the church and imposed a gag order on non-members of the committee.
Palmer Home consulted with T.E. Lott and Company, the accountants who handled its tax matters. Prior to 1981, the IRS accepted the accountants' position that Palmer Home was not required to file a separate revenue form because it was a division of the Presbyterian Church. The accountants were consulted as to the tax consequences of the amendments to the charter. An advisory opinion by a tax attorney stated that, since Palmer was attempting to establish a legal identity separate from that of the church, after the amendment Palmer would no longer be an auxiliary of the church exempt from filing a form 990. The opinion concluded that the amended charter would have no effect on Palmer's tax exempt status but simply require an annual filing of a 990 Form. The Lott company prepared such a form for the fiscal year ending June 30, 1981.
On February 15, 1982, the Palmer trustees resolved to restore the trust language which the 1981 amendment had deleted from the charter. The attorney general refused to permit the filing of this amendment pending an outcome of this dispute.
On May 25, 1982, the appellants, elders of the PCA church, acting as members of the corporation, adopted its own amendments to the Palmer charter, which were approved by the governor within ten days. These amendments restored sections 7 and 8 as they had appeared in the 1977 charter. Section 2 was amended to provide for 16 trustees to be elected by the elders of the Presbyterian church. A new section 12 was added, specifying that the members of the Palmer Home for Children are the duly elected and acting elders of the Presbyterian Church, Columbus, Mississippi, which constitute the church Session. The Session also elected 16 trustees to replace the appellees.
Thereafter, the appellants gave notices or "certificates of incumbency" to banks and the postmaster in Columbus, thereby freezing Palmer assets and interdicting mail delivery. Two of the appellants hand-delivered letters firing executive director Joe Mitchell and staff member Hungerford.
The 1977 charter, restored by the 1982 amendments, required the trustees be divided as equally as possible between PCA and PCUS members. However, all members elected by the appellants were members of the PCA church in Columbus. The Session viewed this as a temporary situation which would be corrected upon resolution of the dispute.
As a result of the actions taken by appellants, appellees were compelled to file suit to determine who were the lawful trustees of Palmer Home. After a full evidentiary hearing, the chancellor took the matter under advisement with briefs submitted on behalf of the parties. On December 28, 1982, the chancellor rendered an opinion. The chancellor found that the 1981 amended charter was the true and valid charter of Palmer; that appellees were the duly and lawfully constituted trustees of the institution; that the appellants' 1982 amendment was null and void, and the appellants were not the legal trustees; and enjoining and restraining the appellants from interfering with the operation of Palmer Home. A final decree in accordance with the opinion was rendered on January 7, 1983.

*411 III.

LAW

A.

WHO ARE THE "MEMBERS" OF THE PALMER CORPORATION AS CONTEMPLATED BY STATUTE?
Mississippi Code Annotated § 79-11-9 (1972) requires that an amendment to the charter of a non-profit corporation must be filed with the Secretary of State "together with a certified copy of a resolution of the members adopting and approving the proposed amendment". Interpreting this statute determines which is valid  the 1981 amendment by appellees or the 1982 amendment by appellants.
To whatever extent this case turns upon conflicting issues of fact, the scope of review requires this Court to consider the evidence as well as all reasonable inferences drawn therefrom in the light most favorable to the appellee. As to issues of fact where the chancellor made no specific finding, this Court is required to assume that the chancellor resolved all such fact issues in favor of appellee. Peoples Bank & Trust v. L & T Developers, Inc., 434 So.2d 699, 704-05 (1983); Cotton v. McConnell, 435 So.2d 683 (Miss. 1983). The chancellor will be affirmed where he reaches a result correct under the law and facts, even though the wrong reason be assigned. Tedford v. Dempsey, 437 So.2d 410 (Miss. 1983). To the extent that the facts are undisputed, e.g. the various charter provisions, the question is one of purely statutory construction. In construing statutes, all statutes in pari materia are taken into consideration and the legislative intent is deduced from the consideration as a whole. Lamar County School Board v. Saul, 359 So.2d 350 (Miss. 1978). Where a popular word used in a statute is given no statutory definition, that word must be accepted in its popular sense, and the Court must attempt to glean from the statute the legislative intent. Lambert v. Ogden, 423 So.2d 1319 (Miss. 1982).
Complicating our task is the failure anywhere in the chapter on non-profit corporations to distinguish between non-profit corporations generally, and charitable corporations such as Palmer Home for Children. Section 79-11-1(1) sets forth no definition of what is a non-profit corporation, but merely catalogues the types of organizations that may incorporate under this chapter:
... [t]he local lodges, chapters or councils, by whatever name known of the Masons, Odd Fellows, Knights of Pythias, Elks, Woodmen of the World, and other fraternal organizations, together with temperance societies and charitable associations, schools, churches, literary institutions, lyceum associations, religious societies, fire companies, mechanics associations, fair associations, agricultural societies, civic improvement societies, little theater associations, amateur (community and school) theater groups, whether already incorporated under non-profit laws or not, real estate apartment owners and managers associations, associations for the establishment of college scholarships on a long-term payment plan, corporations to own and operate rural waterworks systems, rural sewage disposal systems, to provide uniform low cost multi-family housing, cemeteries and corporations for dental services, medical and surgical purposes or for establishing, maintaining and operating local clinical, pathological, medical or surgical research laboratories, hospitals, institutions of learning, gymnasiums, economic and industrial development associations and law enforcement planning associations, ... .
The sole common factor in these organizations is the absence of the profit motive, i.e., a pecuniary return on one's investment, which is the basis of business corporations. Review of the above list shows that non-profit corporations encompass those whose purpose is truly altruistic as well as those whose aid is limited to its membership, e.g. benevolent or fraternal organizations, labor unions, and rural, medical, and industrial co-operatives. *412 Charitable corporations such as Palmer Home for Children have as their goal the improvement of the welfare of others, so that membership in this sort of corporation manifests freedom from selfishness. See H. Oleck Non-Profit Corporations, Organizations, and Associations, 3d Ed. § 3 at 7-11 (1974).
We must bear in mind this usual and ordinary understanding of membership in a charitable corporation in the absence of an express statutory definition.
Next, attention is directed to several other uses of the word "members" in the non-profit corporation statutes. § 79-11-1 provides that a charitable association may be incorporated on the application of any three members. Subsection (2)(g) provides that each member shall have the right to one vote in the election of all officers. § 79-11-13 provides for notice to members of a meeting to surrender the corporate charter. § 79-11-15 requires a 2/3rds vote of the members to institute proceedings for dissolution of the corporation. § 79-11-23 passes all real and personal property to the members upon the dissolution of the non-profit corporation.
From these statutes, several indicia of membership are evident. The members are those who bring the corporation into being, vote for corporate officers, vote to dissolve the corporation, and on dissolution receive the assets of the corporation.
Turning to the facts, Palmer came into existence under the Mississippi corporation law as an independent legal entity with the usual rights to hold property in its own name, manage its own business, and alter or repeal its charter provisions in order to carry out its charitable purposes. Title to all Palmer property has remained in the name of the corporation itself, and since 1950 the charters have recognized that the corporation is owned by the board of trustees.
The original Palmer charter of incorporation lists 18 persons as incorporators. It does not recite that these persons were acting in their official capacity as members of the church Session. No where in any of the charters from 1895 until the contested 1982 charter was there any express provision defining who were the members and what were their rights. For obvious reasons, this is the better procedure to follow. In its absence, we must deduce from the substantive exercise of rights of membership afforded by statute who are the true members of the Palmer corporation.
The right vested by § 79-11-1(2)(g) in each member to elect officers of the non-profit corporation has exclusively been exercised by the appellees and their predecessors in interest, the Palmer board of trustees. By contrast, we are compelled from the conflicting evidence to conclude, as the chancellor must have, that the non-statutory right of "election" of the board of trustees by the church Session was a perfunctory approval of individuals already chosen by the board of trustees. This is seen from the use of the word "approved" as frequently as "elected" in the church minutes. We reject the church's interpretation of the sanctity of the charter election rights because of the church's own disregard of those rights held by the Synods in 1956. Whatever were the plans of the Synods, the action by the Session and its trustees was unilateral and unaccompanied by any representation by the Synods' trustees. The board of trustees who took out the appellants' charter election rights, however, included both present and former members of the appellant church. Therefore, under the peculiar facts of this case we conclude that the right to elect or approve the trustees contained in the charter was a privilege revocable by the members of the corporation.
The particular right in question in this case, to amend the corporate charter under § 79-11-9, has not always exclusively been exercised by either the appellants or appellees. However, the 1965 charter and 1977 amendments thereto eliminated significant charter rights previously held by the church, namely, the right to approve rules and by-laws adopted by the trustees and to at least 1/3rd representation of the church *413 on the board of trustees. These fundamental ties were severed by resolution of the board of trustees alone; no consent of the Session was sought or required.
The final indication of membership found in the non-profit statute is to whom do the assets revert on dissolution of the corporation. This question is determined by the charitable trust language contained in the charter. The appellants take the position that Palmer assets will revert to the Columbus church to be used to care for needy and destitute children. If this use should cease, appellants assert a 1/3rd interest would revert to the Mississippi Synod, and 2/3rds would go to the church.
Appellees take the position that disposition of the assets would be for the chancery court to resolve by reference to the cy-pres doctrine, or the equitable doctrine of approximation. Appellees argue that the appellants should not receive a windfall in the form of contributions not made to the Columbus church, but to support the orphanage. In the context of dissolution of charitable corporations, where the property is held in a trust for a restricted purpose, the property should not pass to the members of the charitable corporation but the cy-pres doctrine should be applied. See Committee on Charitable Trusts Duties of Charitable Trust Trustees and Charitable Corporation Directors, 2 Real Property, Probate and Trust Journal 545, 551-52 (1967).
Membership in Palmer cannot be pinned down by determining who would receive the assets upon dissolution, as in an ordinary corporation, because Palmer is a charitable corporation whose assets are for the benefit, not of the members, but of needy and destitute children. The peculiar nature of this charitable corporation is manifest in two ways. First, the donors and beneficiaries of Palmer are so numerous and unascertainable that it would be wholly impractical to require their consent for changes in the corporate charter. Second, the ultimate use to which the corporate assets are put remains the same whether Palmer, as a corporate entity, administers them or not.
Upon consideration of the lengthy history and the legal principles involved, we affirm the chancellor's ruling that the members of Palmer corporation are the members of the board of trustees, and not the members of the church session. The trustees are peculiarly fit to determine the course of action the corporation should take to effect greater financial support where the basic functions, purpose, and role of the orphanage remain unchanged. They hold and administer the properties and they alone represent the interest of both donors and beneficiaries. We hold that under the corporate charter as it had developed by 1977, the trustees had assumed all powers of membership and, therefore, were the members as contemplated by the chapter on non-profit corporations who exercised the rights of membership enumerated therein.
We hasten to add that we take seriously the appellees' disclaimer in their pleadings and testimony of any interest in their individual capacity to Palmer property, real and personal.

B.

WAS THE 1981 CHARTER AMENDMENT VALID?
The 1981 charter, like the 1965 and 1977 charters, was accompanied only by a resolution of the board of trustees of Palmer Home for Children. If we were to hold that the appellants were the members of the Palmer corporation whose resolution of approval must accompany any charter amendment under § 79-11-9, then the 1965 charter as well as the 1977 and 1981 amendments thereto would be void. Under this reasoning, the last valid charter would have been the 1954 charter containing voting rights for the Louisiana and Mississippi Synods.
Appellants cite two cases, Brennan v. Minneapolis Society for the Blind, Inc., 282 N.W.2d 515 (Minn. 1979), and Kroeger v. Sioux Falls Humane Society, 83 S.D. *414 595, 163 N.W.2d 539 (1969), which establish that the directors of a charitable corporation may not by amending the articles of incorporation or by-laws unilaterally eliminate rights of membership established in the corporation by the by-laws or articles of incorporation. Appellants contend that, although no express provision of the charter designated them to be members, the chancellor should have looked beyond the form of the charter to the substantive membership right of election which they enjoyed and exercised.
The appellees distinguish these two cases on the basis that the corporate charters in question expressly defined who were the members of the corporation, while in the case sub judice there is no such definition. Also, appellees points out that if one adopts the rule of law in the appellants' cases, then the appellants themselves are guilty of unilaterally eliminating the membership rights of the Mississippi and Louisiana Synods by the same technique of amending the charter. In order for the appellants themselves not to be guilty of the same conduct, the right to select trustees would have to be construed as merely a revocable privilege.
In this connection, appellees point out that numerous cases recognize that a voting member of a charitable corporation, having no ownership interest in that corporation, is not deprived of any vested interest when he is deprived of his right to vote. Jessie v. Boynton, 372 Mass. 293, 361 N.E.2d 1267, 1270 (1977); Langrock v. Porter Hospital, Inc., 126 Vt. 233, 236, 227 A.2d 291, 293 (1967). Appellees also cite Vernon Manor Co-Op. Apartments v. Salatino, 15 Misc.2d 491, 178 N.Y.S.2d 895, 901 (1958), for the rule that no vested rights may be built on a permission granted.
Since we have concluded that the chancellor correctly found that the appellees were the members of Palmer corporation, it follows that they were such members as contemplated by § 79-11-9 who must adopt and approve an amendment to the corporate charter. If the pre-1981 charters in fact granted membership rights to the appellant, then the rule in Brennan and Kroeger would apply not only to invalidate the 1981 charter but also the 1965 charter which divested the Synods of their rights of membership without their permission.

C.

HAVE THE APPELLEES DIVESTED THE APPELLANTS OF AN EQUITABLE INTEREST?
Appellants point out that all of the charters to 1977 included a provision that the properties be held in trust for the use and benefit of the appellant church. Appellants argue that the appellees breached the trustee duties ordinarily owed to beneficiaries, including the fiduciary duty of loyalty, to communicate all material facts in connection with transactions, and the duty to keep and render clear and accurate accounts with respect to the administration of the trust. Restatement of Trusts 2nd, § 172. Moreover, the appellants argue that the appellees have breached their fiduciary duty to act in good faith and deal fairly with the beneficiaries, and have instead attempted to rid themselves of the trust obligation which they voluntarily assumed. See Holmes v. Jones, 318 So.2d 865, 869 (Miss. 1975).
The appellees argue that as soon as judicial removal of appellants' interference clears the way for the Attorney General's office to accept the amendment adopted in 1982 by the trustees to reinstate the trust language, this portion of the charter will be restored. Since they have committed themselves by both testimony and documentary evidence to restore the "in trust" language as soon as the Attorney General's Office will accept such an amendment, this issue is rendered moot.
Appellees also argue that appellants' attempts to place themselves in the position of the beneficiary of the charitable trust contradict the express terms of the charter which provide that the object of the charity shall be needy orphaned children. Appellees contend there is no evidence that there *415 has been any prejudice to the true objects of the charitable trust, namely the children.
We conclude that the issue of whether the appellees were guilty of a breach of fiduciary duty as trustees under the terms of the Palmer charter when they deleted the "in trust" language from the charter is moot. The appellees have demonstrated in their pleadings, corporate resolutions and testimony, their intent to reinstate the language in question. We affirm the chancellor on this point, with express directions to the appellees to file the amendments reinstating the "in trust" language in question.

D.

WAS THERE A BREACH OF CONTRACT?
The appellants point out that the 1950 amended charter incorporated a 1902 agreement between Palmer Orphanage and the Synod of Mississippi whereby the Synod received 2/3rds interest and proportionate voting rights in the orphanage corporation with the appellant church receiving the remaining 1/3rd interest in voting rights. The right of officers of the appellant church to elect members to the Palmer corporation was carried forward with some modifications to the 1977 amended charter. Appellants argue that the 1981 elimination of those rights was a breach of contract, the consideration for which was the appellants' support of the orphanage.
The appellees argue that the original proposition was between the Palmer orphanage and the Mississippi Synod, and the appellant church was not a party to the contract. Even if the church were a party, the appellees charge that the appellants breached the contract in 1956 by depriving the two Synods of their vested equitable rights and voting rights.
This Court concludes that there was no contractual obligation in favor of the appellants created by the agreement between the Synod and the Palmer Orphanage. In order to maintain an action to enforce a breach of contract or to recover damages growing out of a breach, a relationship of privity of contract must exist between the party damaged and the party sought to be held liable for the breach. Burns v. Washington Savings, 251 Miss. 789, 171 So.2d 322 (1965). Even if there were, we would hold that there was a failure of consideration in 1956 when the appellants breached their "agreement" to permit the Louisiana and Mississippi Synods to elect 2/3rds of the trustees. The chancellor is affirmed on this point.

E.

WERE THE APPELLEES ESTOPPED FROM DENYING THE POWER OF THE APPELLANTS TO ELECT THEM TO OFFICE?
The appellants argue that the trustees should be estopped to deny the authority by which they were placed in a position of trust, namely the action of the officers of the church. The appellants base their argument on the premise that each of the trustees was elected by representatives of the church and must acknowledge the authority of the church to elect them or decline to hold office. Zimmerman v. Planters Cotton Press Storage and Transfer Ass'n, 1 Miss.Dec. 256 (1885).
Appellees argue that the appellants' position is based on the erroneous assumption that the elders of the church are members of the corporation. The appellees contend that the right to vote for trustees of Palmer was a privilege extended to the church and the true authority by which they held office was their selection by previous trustees.
We rule that the appellees hold their office by virtue of selection by previous trustees, subject to the appellants' revocable privilege to approve them, therefore, the appellants have no authority to elect by which the appellees would be estopped.
This assignment of error is without merit.

*416 F.

DID THE CHANCELLOR ERR IN EXCLUDING A PALMER ORPHANAGE HISTORY AS AN ANCIENT DOCUMENT?
Appellants admit that at the time of trial the survey was one year less than thirty years old. Appellants admit that the document does not technically qualify under the rules established by the cases they cite because it does not meet the 30-year age requirement. See e.g. Nixon v. Porter, 34 Miss. 697, 706 (1858) (38 years); Hughes v. Wilkinson, 37 Miss. 482, 487 (1859) (30 years); White v. Inman, 212 Miss. 237, 54 So.2d 375 (1951) (60 years); Burkley v. Jefferson County, 213 Miss. 836, 58 So.2d 22 (1952) (70 years). However, the appellants argue that to exclude the survey would be improper in view of its obvious trustworthiness, relying upon Federal Rule of Evidence 803(16).
Appellees argue that the chancellor correctly excluded this document under the cases noted by appellants. Moreover, objection at trial was originally based on the nature of the document as personal, not official. Nothing in the record showed that it had the status of a document acted upon, accepted, or approved by the board of trustees.
In the context of a six-volume record exceeding 1,000 pages and 47 numbered exhibits, we cannot say with confidence that exclusion of this document was improper. It did not meet the ancient documents requirement of being 30 years old or more, and it was not shown that the document possessed sufficient status with the board of trustees. This assignment of error is without merit.

IV.

CONCLUSION
The result in this case is due in no small part to the absence of a provision specifying the membership in the Palmer charter. The chancellor was presented with lengthy and complicated facts and resolved the legal question without any previous guidance from this Court on non-profit corporations. In the absence of manifest error, we are required by our prior cases to affirm his decision.
AFFIRMED.
PATTERSON, C.J., WALKER, and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, and ANDERSON, JJ., concur.
PRATHER and ROBERTSON, JJ., not participating.