IRVING, J.,
for the Court:
¶ 1. After Cynthia A. Stewart, an attorney, abandoned premises that she had leased from Bridge Properties, LLC, Bridge Properties successfully sued her in the Hinds County County Court for rent for the months remaining on the contract. A judgment was entered against Stewart in the amount of $35,263.40. Stewart appealed to the Hinds County Circuit Court, which affirmed the judgment of the county court. Stewart’s appeal is now before this Court, where Stewart asserts that: (1) the circuit court should have found that the doctrine of accord and satisfaction necessitated a ruling in her favor; (2) the circuit court erred in finding that a viable lease was presented to the county court; (3) the circuit court erred in affirming the county court’s finding that the leased premises were inhabitable; (4) the circuit court erred in affirming the county court’s finding that Bridge Properties made a sufficient attempt to mitigate its damages; and (5) the circuit court erred in finding that Stewart was not entitled to damages for her expenditures in moving out of the leased premises.
¶2. Finding no error, we affirm the judgment of the circuit court.
FACTS
¶ 3. Stewart and Bridge Properties entered into a lease agreement on October 28, 2003. The leased premises were located at 222 North President Street, Jackson, *981 Mississippi, and Stewart paid Bridge Properties $1,700 per month in rent. The lease specified that Stewart would receive use of the property for 36.5 months for the consideration of $62,050, to be paid in monthly installments of $1,700. Stewart rented suite 802 and used it as office space; later, Stewart and Bridge Properties agreed to increase the amount of space rented in return for an additional $800 per month in rent. Stewart sublet office space to Cynthia Speetjens and Judson Lee, both of whom are also attorneys.
¶ 4. The parties proceeded with the lease agreement without issue until 2005. Stewart contends that problems with the property began early that year and continued until she felt that the premises were no longer usable for business purposes. In July 2005, Stewart and her office mates vacated the premises. There is some dispute as to exactly when Stewart vacated the premises; as the county court found, Stewart was out by July 31, 2005, at the latest. It is also undisputed that Stewart was initially unable to access the premises on the day that she moved out due to the fact that Tyson Bridge, the owner of Bridge Properties, changed the locks to the office due to Stewart being two months behind in her rental obligations. On July 22, 2005, Lee provided Bridge with a check for $7,500, upon which Bridge provided either Stewart or Lee with a key to the premises, and they proceeded to move their belongings out of the office.
¶ 5. Bridge testified that he realized that Stewart, Speetjens, and Lee had vacated the premises sometime in late July 2005, when Bridge arrived at the building and noticed that the space that had been rented by Stewart was empty. It is undisputed that Stewart did not provide Bridge Properties with any written notice of her intent to vacate the premises. However, Stewart testified that she informed Bridge orally of her intent to vacate about two weeks before she left the premises; Bridge denied that any such conversation took place. On August 8, 2005, a week or two after Bridge realized that Stewart had vacated the premises, Bridge sent Stewart a letter reminding her that the term of the lease had not expired and that she was in violation of the lease due to her abandonment of the premises. The record indicates that a second letter was sent to Stewart on October 4, 2005, again reminding her that she was in default of the lease. The letter stated that it was a final demand and that Bridge Properties might “exercise any available rights and remedies under the law” if Stewart did not continue paying rent. On November 21, 2005, Bridge Properties filed a complaint against Stewart in the county court, alleging that Stewart was in default of the lease; the complaint requested $10,200 in damages for unpaid rent and for attorney’s fees and court costs. Stewart filed an answer and counterclaim, and on May 24, 2006, a motion for summary judgment. In her counterclaim, Stewart sought damages from Bridge Properties for her moving expenses incurred when she relocated her office to Madison, Mississippi.
¶ 6. At trial, Stewart testified that the premises had become unsuitable for business due to non-functioning air conditioning, frequent electrical outages, screaming matches between Bridge and his then-wife, leaks in the ceiling, an unidentified brown substance that collected on the walls and floor, a non-functioning alarm system, and the large number of transient individuals in the area.
.¶ 7. Regarding the air conditioning, Stewart testified that the air conditioner was turned off “after business hours and on weekends....” Stewart stated that this was contrary to her understanding of her lease agreement. However, the lease sub *982 mitted into evidence clearly states that air conditioning would be provided only during normal business hours. Bridge testified that he would turn the air conditioner on at other times if a request was made in advance to do so. Stewart also testified that the air conditioner did not function properly during business hours, such that she and her office mates “would sometimes have to leave the office to be able to work.” When questioned regarding how ■frequently the air conditioning was insufficient, Stewart testified that “by the time it got hot, it was constant. By the time it got hot and stayed hot, it was constant.” Stewart asserted that she and her office mates “complained constantly” to “anybody that would listen.” Stewart claimed that complaints had been made to Bridge personally regarding the air conditioning. Lee testified that the temperature was sometimes warm in his office; when questioned as to the frequency of the problems, Lee stated that he observed problems “like once a week.” Speetjens’s recollection of the frequency of air conditioning problems differed from both Stewart’s and Lee’s; when asked about how frequently the air conditioner malfunctioned, Speetjens stated: “It wasn’t every week certainly, but it was not uncommon....” Despite the severity of the problems that Stewart described, there is no evidence that any complaint was ever made to any Bridge Properties employee by e-mail or in writing. Thus, there was only testimony to prove that there had ever been a problem with the air conditioning. Bridge Properties’ witnesses testified that the air conditioner functioned properly. Jim Peters, a building-repair consultant who worked for Bridge Properties, testified that during the time that Stewart rented, there was “more than one occasion, less than five, to ever have any problems [with the air conditioning].” Peters testified that he had to have a repairman add Freon to the air conditioner one time during the time period in question; Peters indicated that all of the problems or repairs were “very routine.”
¶ 8. As to the alarm, Stewart testified that she was given a code to use with the security system but that it “didn’t work.” Stewart elaborated that “[t]here was no cause and effect between putting any numbers into the pad or not putting any numbers into the pad and anything that happened as a result of doing or not doing that.” Stewart testified that the alarm system never worked. Bridge testified that the alarm system worked properly but that he eventually turned it off because the tenants in the building were unable to remember their access codes or properly enter them; as a result, the alarm was set off numerous times without an actual intrusion.
¶ 9. Stewart testified that the electricity in the office was so insufficient that if the microwave in the office was used, “the lights went out in the back half of the office.” She testified that the circuit in question had a refrigerator, microwave, and coffee pot that were connected to it. Stewart indicated that the electrical problems occurred on a “daily” basis. Speetjens testified that the problems occurred “all the time,” but when asked more specifically as to the frequency of the problems, Speetjens stated that they happened “[a]t least once a week if not more.” As with the air conditioning, Stewart testified that she and her staff complained to Bridge Properties employees, including Bridge, on a frequent basis. Lee testified that he recalled the suite losing power on “several occasions”; when questioned as to frequency, Lee testified that the suite lost power “about once a week.” Like Stewart’s complaint with the air conditioning, there is no documentary evidence to show that a complaint was ever made regarding *983 the electrical wiring. Travis Grace, an employee of Bridge Properties, testified that the kitchen contained a 20-amp breaker that Stewart’s office had overused. Grace stated that he informed Stewart and her office mates that they had too many appliances plugged in, which was causing the electrical problems. Grace testified that even if too many appliances were turned on, the situation was easily remedied by throwing the relevant breaker. Bridge testified that the first time that the electricity had problems was when one of Stewart’s employees attempted to use her hairdryer in the kitchen while running other appliances.
¶ 10. When asked to describe the various leaks on the premises, Stewart testified that: “The main water leak was in Ms. Speetjens’[s] office, and it required more than one bucket, and it occurred every time it rained, and the buckets were still there when we left.” Lee testified that there were leaks in his office and in Speetjens’s office. Lee indicated that the leak in his office ruined a file, which Bridge Properties paid to have recopied. Ed Peters, an attorney who occasionally worked with Stewart, testified that there were regular leaks and stains in Speetjens’s office. Grace testified that he recalled one leak in Speetjens’s office but that it was repaired, and that there were no further complaints about leaks. Like Grace, Bridge recalled only the leak in Speetjens’s office; he testified that the leak was repaired shortly after it was brought to Bridge Properties’ attention.
¶ 11. When asked about other leaks, Stewart testified about the unidentified brown substance that came from the ceiling: “There was another leak that was in the hallway across from the kitchen. It was not a rain leak because it occurred regardless of the weather. It was some kind of sludge that came out of the ceiling, down the wall, and on the floor. It was extremely nasty.” Stewart testified that this substance did not only come with rain but that it dripped down the wall on a “daily” basis. She further testified that Bridge Properties employees had cleaned the substance up two or three times but that she and her office mates also cleaned it themselves. Lee testified that the brown stain in the hallway was cleaned a few times by the cleaning crew but that Bridge Properties never did anything to repair the leak.
¶ 12. As to the alleged fights between Bridge and his wife, Stewart testified that the couple fought “several” times during the spring and summer of 2005. She indicated that she could not see the fights, but that: <£You could hear the voices. They were in another part of the building. I don’t know whether they were in the back part ... or in the side part.... But you could hear it all over at least the third floor.” Stewart testified that these arguments caused her concerns when scheduling appointments with her clients, as the incidents were “embarrassing” and unpredictable. Testimony was also introduced showing that Bridge was arrested once on the property, although the arrest report indicated that the arrest was carried out without incident. Speetjens testified that she heard disturbances between Bridge and his estranged wife “on maybe four occasions.” Bridge denied that he had any arguments with his estranged wife during Stewart’s occupancy.
¶ 13. Stewart testified that the number of homeless people around the building became a concern, “particularly since there was no security.” Stewart indicated that she saw homeless people urinating in the parking lot of the office and that the problem became severe enough that she instructed her secretary to complain to Bridge about the situation. Stewart also *984 thought that she might have personally complained to Bridge about the situation. Lee related seeing a vagrant urinating in the office’s parking lot one day during lunch; Lee testified that he did not observe any other problems with vagrants but that a paralegal had expressed concerns, leading Lee to try “to stay later than everybody else at night if they needed [him] to walk them out.” Bridge Properties’ witnesses acknowledged that there may have been homeless people around the office but that the presence of such individuals was well known before Stewart entered into the lease.
¶ 14. At trial, Stewart claimed an affirmative defense of accord and satisfaction; essentially, Stewart argued that Bridge Properties accepted Lee’s $7,500 check in lieu of fulfillment of the remainder of the contract. There was a significant dispute at trial as to exactly what occurred on the morning of July 22, 2005, when Lee tendered the check to Bridge. The facts related to that morning will be discussed in more detail later in this opinion. Stewart also claimed that Bridge Properties did not act appropriately to mitigate its damages from her vacancy. Bridge disputed this at trial, stating that he had contacted a realtor and attempted to lease the office space.
¶ 15. After hearing all of the testimony, the county court recessed and eventually issued a judgment finding that Stewart had failed to prove that the office was unusable for business purposes. The county court found that, pursuant to the lease agreement, Stewart had abandoned the premises, and thus defaulted on the lease. Accordingly, the county court ordered Stewart to pay Bridge Properties $35,263.40 in attorney’s fees and rent, representing the rental amounts for the remainder of the lease’s term. In its order, the county court stated the following in pertinent part:
Plaintiff contends that Defendant breached the lease agreement and moved out of the demised premises without any justification. The Defendant contends 1.) that the premises became uninhabitable because of several individual reasons and also because of the totality of the individual reasons[,] and 2.) there was an accord and satisfaction between Plaintiff and Defendant where they agreed to mutually terminate the lease agreement as of the end of July 2005.
1.) Analysis of uninhabitability of the premises:
a.) Defendant alleges that the security system never worked. Plaintiff testified that Defendant could not figure out how to work the alarm code and that nothing was wrong with it. Plaintiff had ADT Security Systems, Inc.[,] activate the existing alarm system in the building on June 9, 2004, and pre-paid an annual fee of $420.00, plus tax, for the alarm service .... Defendant offered no proof that the alarm system didn’t work other than her own testimony that it didn’t.
b.) Defendant alleges that beginning April 2005 the air conditioning developed problems and it would not adequately cool the offices and from time to time work would have to be taken to another location to be done and clients would complain. This allegation was somewhat corroborated by other witnesses for Defendant. Defendant [sic] argues that there was no problem with the air conditioning and he would know because his office was on the same floor as Defendant’s and serviced by the same unit. Plaintiff had full[-] and part[-]time employees that visited all of the properties owned by Plaintiff on an almost daily basis and they testified that there *985 was no problem, and if there was a problem[,] all Defendant had to do was tell them and it would have been repaired. Jim Peters, an employee or consultant of Plaintiff[,] testified that he turned the air conditioning on every day at 4:30 a.m. and that nobody from Defendant’s office had ever complained to him about a problem. He did testify that there were routine maintenance problems, but they were always immediately corrected. Additionally, Cynthia A. Stewart was someone whom Jim Peters had personally known for many years prior to the lease agreement being entered into[,] and she had his cell number to call if there were any problems with the premises, not just the air conditioning. Travis Grace, Vice President of Operations for the Plaintiff[,] testified that he was in and out of the office next door to the Defendant’s 4 or 5 times a day during this period of time and never experienced any problems with the air[-]conditioning system. Air conditioning was only provided during business hours and had to be specially requested after hours....
c.) Defendant alleges that after April 2005 on one occasion from one of the office windows she could see what looked to her like a homeless person urinating in the parking lot[,] and there would be homeless people from time to time in the area of the building. Plaintiff was not present at these times and therefore did not deny the allegations. However, Plaintiff pointed out in his testimony that the building is located in downtown Jackson and is very close to a park that for years has been plagued by vagrants, homeless[,] and undesirables, and that these conditions have existed for many years prior to Defendant entering into the lease agreement.
d.) Defendant contends that after April 2005 roof leaks developed in one of the offices and that buckets had to be placed there to collect the rain and that a substance at the leak sites smelled and looked horrible. Plaintiff admitted that there was a leak but that he sent Travis Grace to the roof to repair it, that it was only one leak, and that it was repaired.
e.) Defendant alleges that after April 2005 the electricity in the break room was not working properly and the electricity would go off from time to time. Travis Grace testified that there was a 20[-]amp breaker for the break room which was more than adequate. He also testified that when called to the room to see what the problem was[,] he discovered a hairdryer and other appliances that were overloading the circuit. In any event, he said all Defendant had to do was unplug some of the extra appliances and throw the tripped breaker.
f.) Defendant alleges that toward the end of 2004 and into 2005[,] Tyson Bridge and his wife were going through a bad divorce[,] and things got so bad that police were called to the building and he and his wife would get into yelling matches. Testimony did show a police report dated December 30, 2004[,] where officers went to the subject premises and arrested Tyson Bridge for the felony of house burglary but he was arrested there “without incident” ....
The Court finds as a matter of fact that the Defendant’s complaints, whether taken individually or cumulatively, do not warrant or justify the cancellation of the lease agreement ... or rise anywhere close to a level that would render the demised premises uninhabitable for their intended purposes.
[[Image here]]
3.) Mitigation of damages: The undisputed testimony of the Plaintiff is that after Defendant vacated the premises[,] *986 he talked to four realtors, put a “for rent” sign on the building, and showed the demised premises three or four times during the remaining term, all in an attempt to mitigate his damages. The Court finds as a matter of fact that the Plaintiff used reasonable efforts to mitigate his damages but was unsuccessful in doing so.
4.) Counter-Claim of Cynthia A. Stewart, P.A.: While the Court heard testimony that Counter-Plaintiff suffered damages as a result of her move from the demised premises to her new office in Madison, Mississippi, this Court finds as a matter of fact that the Counter-Defendant’s actions or inactions as alleged by the Counter-Plaintiff were not the cause, the contributing cause, or the proximate cause of the Counter-Plaintiff vacating the premises in July 2005, and therefore the Court finds for the Counter-Defendant with regard ... to the Counter-Claim.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 16. Our supreme court has discussed the standard of review to be applied in cases that originate in the county court and are then appealed to the circuit court:
The county court was the fact finder, and the circuit court, as well as [the Mississippi Supreme Court or Court of Appeals], are bound by the judgment of the county court if supported by substantial evidence and not manifestly wrong. W.H. Hopper & Assoc[s.], Inc. v. DeSoto County, 475 So.2d 1149, 1152 (Miss.1985); Dungan v. Dick Moore, Inc., 463 So.2d 1094, 1100 (Miss.1985); Ellis v. S. Pellegrini, Inc., 163 Miss. 385, 391, 141 So. 273[, 274] (1932). Insofar as its findings of fact and conclusions of law are concerned, the judgment of a circuit or county court in a non-jury trial is entitled to the same deference on appeal as a chancery court decree. Rives v. Peterson, 493 So.2d 316, 317 (Miss.1986). That is, it will be assumed the trial judge made all necessary findings of fact in favor of appellee, whether stated or not. Brown v. Williams, 504 So.2d 1188, 1191 (Miss.1987); Rives [493 So.2d at 317]; Bryant v. Cameron, 473 So.2d 174, 179 (Miss.1985); Dungan ..., [463 So.2d at 1100]; Cotton v. McConnell, 435 So.2d 683 (Miss.1983). Moreover, if the judgment of such court can be sustained for any reason, it must be affirmed, and even though the trial judge based it upon the wrong legal reason. Shewbrooks v. A.C. [&] S., Inc., 529 So.2d 557[, 564] (Miss.1988); Allgood v. Bradford, 473 So.2d 402[, 411] (Miss.1985); Briggs v. Benjamin, 467 So.2d 932[, 934] (Miss.1985); Tedford v. Dempsey, 437 So.2d 410[, 418] (Miss.1983); Taylor v. F. & C. Contracting Co. ..., 362 So.2d 625[, 628] (Miss.1978); Tex[] Gas Transmission Corp. v. City of Greenville, 242 So.2d 686[, 689-90] (Miss.1970); Lee v. Memphis Publ[’g] Co., 195 Miss. 264, [278,] 14 So.2d 351[, 353] (1943).
Patel v. Telerent Leasing Corp., 574 So.2d 3, 6 (Miss.1990) (emphasis added).

1. Accord and Satisfaction

¶ 17. In her first contention of error, Stewart contends that she successfully established the affirmative defense of accord and satisfaction.
¶ 18. In Mississippi, there are four elements that must be satisfied in order for an accord and satisfaction to exist: (1) something of value must be offered “in full satisfaction of a demand”; (2) the offer must be “accompanied by acts and declarations [that] amount to a condition that if the thing is accepted, it is accepted in satisfaction”; (3) “the party offered the *987 thing of value” must “understand that if he takes it, he takes subject to such conditions”; and (4) the party offered the item must “actually ... accept the item.” Waggoner v. Williamson, 8 So.3d 147, 156 (¶ 18) (Miss.2009) (quoting Channel v. Loyacono, 954 So.2d 415, 426 (¶39) (Miss.2007)).
¶ 19. In its ruling, the county court found the following regarding an accord and satisfaction:
Cynthia A. Stewart testified that she told Tyson Bridge a couple of weeks before July 22, 2005[,] that she, the other lawyers in her office, and her staff were all vacating the premises and would be out by the end of July 2005. This notification was not in writing and no one else was present. On the morning of July 22, 2005[,] she along with the rest of her staff arrived at the premises to discover that the locks on the door to the office had been changed and no one could get in. After what the parties testified to as very heated exchanges in the hallway, Tyson Bridge opened the door to allow attorney Jud Lee to enter the premises for the purpose of getting one of his personal checks and paying all of the past due rent owed to Plaintiff by the Defendant. He in fact did so and wrote a check to the Plaintiff in the amount of $7,500.00[,] which the Plaintiff cashed.... Both parties agree that this was the total sum due to the Plaintiff for past due and current rent up to July 31, 2005. Defendant contends that the payment of this check ... was an accord and satisfaction.
... Defendant offers no evidence to prove accord and satisfaction. No one was present other than Cynthia A. Stewart and Tyson Bridge when Cynthia A. Stewart alleges the accord and satisfaction was reached, [and] the check which she claims was consideration for the accord and satisfaction ... makes no indication on the front or back that it was intended for that purpose[,] and there is no writing or any other evidence whatsoever to support the Defendant’s contention ....
Additionally, paragraph 18 of the lease agreement ... addresses the issue of surrender of premises. “No action of the Landlord or its agents during the term hereby granted shall be deemed an acceptance of a surrender of the Demise[d] Premises, and no agreement to accept a surrender of the Demised Premises shall be valid unless the same be made in writing and subscribed to by the Landlord.” Defendant offers no evidence to show that Plaintiff accepted a surrender of the premises pursuant to the lease agreement....
Defendant has failed to prove the affirmative defense of accord and satisfaction by a preponderance of the evidence.
¶ 20. As already stated, we employ a highly deferential standard of review in county court eases. Having reviewed the record, we find no reason to reverse the judgment of the county court on this point. Bridge testified that the July 22, 2005, check was tendered to pay the past due amount of rent that was owed, not to release Stewart from the lease. The county court was within its rights in finding Bridge’s testimony regarding the check more compelling than Stewart’s. Accordingly, there is no merit to Stewart’s arguments on this point.

2. Viability of Lease

¶ 21. Stewart argues that the lease attached to Bridge Properties’ complaint was insufficient because it did not adequately describe the leased premises.
¶ 22. While the property description in the lease did not describe the leased prem *988 ises, the signature page containing Stewart’s signature clearly stated the address of the property. Furthermore, the lease was offered into evidence at trial without objection from Stewart.
¶ 23. There is no merit to this contention of error.

3. Uninhabitability

¶ 24. As discussed earlier in this opinion, Stewart and her witnesses essentially testified as to the uninhabitability of the premises, while Bridge Properties’ witnesses testified to the contrary. Again, there is no documentary evidence to support Stewart’s assertions. The county court was entitled to find Bridge Properties’ witnesses more compelling as to the inhabitability of the premises. See In re Estate of Grubbs v. Woods, 753 So.2d 1043, 1052-53 (¶ 39) (Miss.2000).
¶25. This contention of error is also without merit.

Jp. Mitigation of Damages

¶ 26. Bridge testified that he contacted a realtor and put up a “for rent” sign in an effort to rent the premises after Stewart’s departure. The county court did not err in finding that Bridge Properties acted to mitigate the damages caused by Stewart’s early departure. Therefore, this contention of error is without merit.
¶27. Furthermore, this issue is procedurally barred due to Stewart’s failure to offer any authority or argument on this point; the entirety of Stewart’s argument reads: “The Plaintiff failed to adequately mitigate his damages in that the proof he offered at trial in support thereof was insufficient and was not a reasonable, good faith effort to mitigate his damages.”

5. Counterclaim

28. Stewart’s argument on this point is also inadequate; it reads, in its entirety: “The Appellant reasonably incurred expenses in locating other office space as a result of the uninhabitable nature of the demised premises which expenses were directly and proximately caused by the Appellee’s failure to properly maintain the premises.” There are no citations to any authority or to the record in this case. Simply put, there is not enough argument here for this Court to even consider Stewart’s claim.
¶ 29. Regardless, there is no merit to any claim that Stewart was entitled to damages. We have affirmed the county court’s finding that the premises were not uninhabitable; furthermore, as the county court found, there was no evidence presented as to Stewart’s expenses other than her own testimony.
¶ 30. This contention of error is also without merit.
¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., MYERS, P.J., GRIFFIS, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. LEE, P.J., AND BARNES, J., NOT PARTICIPATING.